[No. S000888. May 31, 1990.]

BAY DEVELOPMENT, LTD., et al., Petitioners, v.
THE SUPERIOR COURT OF SAN DIEGO COUNTY, Respondent;
HOME CAPITAL CORPORATION, Real Party in Interest.

1014

**COUNSEL**

Wright & L'Estrange, Robert C. Wright, William R. Nevitt, Jr., Robert S. Robertson and Timothy C. Stutler for Petitioners.

No appearance for Respondent.

Asaro & Keagy, Steven A. McKinley and Richard R. Freeland for Real Party in Interest.

**OPINION**

**KENNARD, J.**—In this case we must decide whether a tort defendant that has entered into a good faith settlement with the plaintiff remains liable to other defendants for an indemnity claim that rests on a theory of "implied contractual indemnity." A brief overview of the relevant legal background may help to place this complex issue in perspective.

When a tort action involves multiple defendants, there is often an inherent tension between the state's interest in encouraging the voluntary settlement of litigation and the state's interest in promoting a fair apportionment of liability among the defendants. In an attempt to harmonize these two important interests, California has established a number of interrelated legal principles.

Under California law, when one of a number of tort defendants enters into a settlement agreement with a plaintiff, the nonsettling defendants' liability to the plaintiff is reduced by the amount of the settlement. (Code Civ. Proc., § 877, subd. (a).)[1] ██ If the nonsettling defendants believe

---

[1] Code of Civil Procedure section 877, subdivision (a) provides in relevant part: "Where a release, dismissal with or without prejudice, or a covenant not to sue or not to enforce judgment is given in good faith before verdict or judgment to one or more of a number of tortfeasors claimed to be liable for the same tort . . . it shall have the following effect: [¶] (a) It shall

that the settling defendant has not paid a fair share of the potential liability, and that therefore their liability has not been reduced by a sufficient amount, they may pursue a claim for equitable indemnity against the settling defendant, seeking to compel that defendant to bear an additional share of any liability that may be imposed on them. (See, e.g., *American Motorcycle Assn.* v. *Superior Court* (1978) 20 Cal.3d 578, 604-607 [146 Cal.Rptr. 182, 578 P.2d 899].)

The Legislature has recognized, however, that a defendant is unlikely to settle with a plaintiff if the settlement will not end the defendant's involvement in the litigation and will leave it vulnerable to further liability to other defendants. (See *Stambaugh* v. *Superior Court* (1976) 62 Cal.App.3d 231, 236 [132 Cal.Rptr. 843].) Accordingly, the Legislature has provided that if a trial court determines a settlement was made in "good faith," a settling defendant is relieved of any further liability to the nonsettling defendants for equitable indemnity. (§ 877.6, subd. (c); see, e.g., *Abbott Ford, Inc.* v. *Superior Court* (1987) 43 Cal.3d 858, 871-874 [239 Cal.Rptr. 626, 741 P.2d 124]; *Tech-Bilt, Inc.* v. *Woodward-Clyde & Associates* (1985) 38 Cal.3d 488, 494-500 [213 Cal.Rptr. 256, 698 P.2d 159].)[2]

Under this general framework, the trial court's good faith determination plays a key role in harmonizing the objective of encouraging settlement with the objective of promoting a fair apportionment of loss among multiple tortfeasors. (*Abbott Ford, Inc.* v. *Superior Court, supra*, 43 Cal.3d at p. 873; *Tech-Bilt, Inc.* v. *Woodward-Clyde & Associates, supra*, 38 Cal.3d at p. 494.)

A trial court's decision that a settlement was made in good faith, however, does not absolve a settling defendant from a subsequent indemnification claim in all circumstances. ■ For example, when the settling defendant has previously entered into a contractual agreement to indemnify a nonsettling defendant, a settlement—even if in good faith—does not relieve the settling defendant from performing the contractual indemnification obligations. (See *C. L. Peck Contractors* v. *Superior Court* (1984) 159 Cal.App.3d 828, 834 [205 Cal.Rptr. 754].)

The issue here is whether a good faith settlement by a defendant who has not entered into an indemnification agreement bars a nonsettling

---

not discharge any other such party from liability unless its terms so provide, but it shall reduce the claims against the others in the amount stipulated by the release, the dismissal or the covenant, or in the amount of the consideration paid for it whichever is the greater."

Unless otherwise indicated, all further section references are to the Code of Civil Procedure.

[2] Section 877.6, subdivision (c) provides in relevant part: "A determination by the court that the settlement was made in good faith shall bar any other joint tortfeasor . . . from any further claims against the settling tortfeasor . . . for equitable comparative contribution, or partial or comparative indemnity, based on comparative negligence or comparative fault."

defendant's claim for indemnity when the claim is based on a theory of "implied contractual indemnity," that is, on the theory that the settling defendant's obligation to indemnify should be inferred from some contractual relationship between the defendants. The Courts of Appeal have reached conflicting conclusions on this issue.[3]

In this case, the Court of Appeal held that a good faith settlement bars a claim for implied contractual indemnity. The nonsettling defendants seek a determination that such a claim, like a claim based on an agreement to indemnify, is not barred by such a settlement.

We conclude that the judgment of the Court of Appeal should be affirmed. As we shall explain, our decision in *E. L. White, Inc.* v. *City of Huntington Beach* (1978) 21 Cal.3d 497, 506-507 [146 Cal.Rptr. 614, 579 P.2d 505] establishes that a claim based on an implied contractual indemnity theory is a form of equitable indemnity, and therefore such a claim is barred by a good faith settlement under section 877.6, subdivision (c).

## BACKGROUND

This proceeding arises out of a dispute concerning the Mission Village Condominium Project, a 251-unit condominium development in San Diego. In May 1981, current and former owners of the condominium units filed the underlying lawsuit against Bay Development, Ltd. (Bay), a limited partnership that owns the project, and Bowen Company (Bowen). Bowen was both the general partner of Bay and the real estate broker that marketed the units in the project. The complaint alleged, among other things, that in marketing the condominiums Bay and Bowen had fraudulently misrepresented there were 365 parking spaces for the 251 units when in fact there were only 326 spaces. The complaint asserted that the lesser number of parking spaces diminished the value of the condominium units, and sought damages for the diminution.

Shortly after the action was filed, Bay and Bowen filed a cross-complaint for indemnity against, among others, Home Capital Corporation (Home), the company from which Bay had purchased the property in 1979. In their cross-complaint, Bay and Bowen asserted: (1) Home had incorrectly

---

[3] Compare *Stratton* v. *Peat, Marwick, Mitchell & Co.* (1987) 190 Cal.App.3d 286, 291-292 [235 Cal.Rptr. 374] [a good faith settlement bars a claim for implied contractual indemnity] and *IRM Corp.* v. *Carlson* (1986) 179 Cal.App.3d 94, 109-110 [224 Cal.Rptr. 438] [same] with *County of Los Angeles* v. *Superior Court* (1984) 155 Cal.App.3d 798, 803 [202 Cal.Rptr. 444] [a good faith settlement does not bar a claim for implied contractual indemnity] and *Bear Creek Planning Com.* v. *Title Ins. & Trust Co.* (1985) 164 Cal.App.3d 1227, 1238 [211 Cal.Rptr. 172] [implied contractual indemnity is not a form of equitable indemnity].

represented the number of parking spaces to the California Department of Real Estate in 1978; (2) the Department of Real Estate had relied on Home's representations in preparing its public report on the project; and (3) Bay, in turn, had relied on the report in buying the property and making its own representations to the prospective buyers of the condominiums in the project. The cross-complaint maintained that if Bay and Bowen were to be held liable for the misrepresentations, they would be entitled to be indemnified by Home on the basis of both equitable indemnity and implied contractual indemnity theories.[4]

After the filing of the cross-complaint, plaintiffs filed an amended complaint, substituting Home for one of the Doe defendants included in the original complaint. Thereafter, shortly before the case was to go to trial, Home entered into a settlement agreement with plaintiffs. In return for Home's payment of $30,000, plaintiffs agreed to release, and to dismiss with prejudice, all claims against Home.

Home then filed a motion, seeking (1) a determination that its settlement with plaintiffs was a "good faith" settlement within the meaning of section 877.6, and (2) an order granting summary judgment in its favor on the indemnity cross-complaint of Bay and Bowen. Bay and Bowen opposed the motion, contending that Home's $30,000 settlement was not a good faith settlement and that, even if the settlement had been entered into in good faith, it did not bar their claims against Home, either for equitable indemnity or for implied contractual indemnity.

In support of its motion, Home filed declarations and a deposition transcript of one of Bay's officials to demonstrate that its $30,000 settlement was not disproportionate to its potential share of liability. The declarations stated that opposing real estate experts had variously estimated the diminution in value attributable to the discrepancy in parking spaces to be between $75,000 and $700,000, and that during settlement conferences the settlement judge had suggested $250,000 as a realistic total settlement figure.

---

[4]In support of their claim for implied contractual indemnity, Bay and Bowen alleged that when Home sold the condominium project to Bay in 1979, Home (1) "impliedly warranted" that the statements contained in the initial report of the Department of Real Estate were accurate, (2) knew that Bay would provide the report to its broker to assist in the marketing of the units, and (3) "knew that [Bay] would rely on [Home] having accurately prepared the report and would disseminate the report to the public without materially changing it." Although Bay and Bowen denied that the representations in their marketing materials as to the number of parking spaces were inaccurate, the cross-complaint asserted: "[I]f plaintiffs recover pursuant to their amended complaint against cross-complainants, the recovery will be caused primarily and ultimately by [Home's] breach of contract with [Bay]. Cross-complainants' liability will arise, not as a result of any active fault on its part, but solely as a result of [Home's] breach of contract."

More important, the declarations and deposition transcripts indicated that several Bay and Bowen officials admittedly knew before marketing of the units began that the parking space figure in the initial Department of Real Estate report did not reflect the number of striped parking spaces then existing in the project. According to the declarations, Bay nonetheless submitted the same 365-space figure to the Department of Real Estate when it obtained a second public report on the project, and that second report was actually used by Bay in its marketing campaign.

One of Bay's officials explained in his deposition that Bay did not change the number of parking spaces listed in its submission to the Department of Real Estate because it did not believe the 365-space figure was in fact inaccurate. The Bay official testified that architects had informed Bay there was sufficient room within the project's existing parking area to accommodate 365 parking spaces if the area were restriped and a greater proportion of the spaces sized for compact cars. He also testified Bay had notified the homeowner's association it was willing to restripe the parking lot to create additional spaces by reducing the number of spaces that would accommodate full-size cars.

Home argued that these facts totally undermined the claim of Bay and Bowen that in marketing the units they had reasonably relied on Home's earlier representation of the number of parking spaces. Home asserted that this evidence established that Bay and Bowen, rather than Home, bore the sole, or at least the major, responsibility for any damage plaintiffs might have incurred. In light of this evidence, Home asserted that its $30,000 settlement was generous and clearly within the reasonable range of its potential proportional liability. (See *Tech-Bilt, Inc.* v. *Woodward-Clyde & Associates, supra,* 38 Cal.3d 488, 499-500.)

In their opposition to Home's motion, Bay and Bowen emphasized the disparity between Home's $30,000 settlement and the potential liability attributable to the parking space shortage. They claimed the potential liability could be as high as $1 million. Because Home did not deny that the 365-parking-space figure had originated in its initial representations to the Department of Real Estate, Bay and Bowen argued that Home was primarily responsible for any misrepresentation and that, in view of Home's potential exposure, the $30,000 settlement was "so far 'out of the ballpark' as to be ridiculous." The declarations filed by Bay and Bowen, however, did not refute Home's evidence that Bay and Bowen knew of the parking space discrepancy before they marketed the units.

Bay and Bowen contended that Home's settlement was not in good faith, and that even if it were it did not preclude Home's liability to them on their

cross-complaint for equitable indemnity or for implied contractual indemnity. Noting that the Courts of Appeal were divided on the issue, Bay and Bowen urged the trial court to follow those decisions holding that such indemnity claims survive a good faith settlement.

After a hearing, the trial court resolved all of the issues in favor of Home. It concluded that the settlement was in good faith, barring Bay's and Bowen's indemnity claims.

Bay and Bowen then sought extraordinary writ relief from the Court of Appeal. The Court of Appeal stayed the indemnity action, but permitted plaintiffs' trial against Bay and Bowen to go forward. The Court of Appeal then set the writ matter for oral argument, heard argument in the matter, and decided the matter by a full, written opinion, upholding the trial court's order and denying the requested writ. Thereafter, we granted review.

### DISCUSSION

1. *Procedural Issues*

Before reaching the merits of the substantive claims raised by Bay and Bowen, we address two threshold procedural issues.

The first involves a jurisdictional question. The Court of Appeal issued its decision in this case—a 37-page written opinion—on March 31, 1987, and Bay and Bowen filed their petition for review on May 8, 1987. Under California Rules of Court, rule 24(a),[5] a decision of the Court of Appeal becomes final as to that court 30 days after filing, and under rule 28(b)[6] a party seeking review in this court must file its petition for review within 10 days after the Court of Appeal decision becomes final as to that court. Under the normal operation of these rules, the petition for review in this case clearly was timely filed and no jurisdictional question would arise.

---

[5] Rule 24(a) provides in relevant part: "A decision of a Court of Appeal becomes final as to that court 30 days after filing, except that the decision becomes final as to that court immediately after filing upon the denial of a petition for a writ within its original jurisdiction or a writ of supersedeas, without issuance of an alternative writ or order to show cause, or the denial of an application for bail or to reduce bail pending appeal, or the denial of a transfer to a Court of Appeal in a case within the original jurisdiction of a municipal or justice court; but the denial of a petition for writ of habeas corpus that is filed on the same day as the decision in a related appeal becomes final as to the Court of Appeal at the same time as the related appeal. [¶] When a decision of a reviewing court is final as to that court, it is not thereafter subject to modification or rehearing by that court . . . ."

All further references to rules are to the California Rules of Court.

[6] Rule 28(b) provides in relevant part: "A party seeking review must serve and file a petition within 10 days after the decision of the Court of Appeal becomes final as to that court . . . ."

Rule 24(a), however, contains an exception to the general rule that a Court of Appeal decision becomes final as to that court 30 days after filing, stating "that the decision [of the Court of Appeal] becomes final as to that court immediately after filing upon the denial of a petition for a writ within its original jurisdiction . . . without issuance of an alternative writ or order to show cause . . . . " (See *ante*, at p. 1023, fn. 5.) ▮ Because in this case the Court of Appeal did not formally issue either an alternative writ or order to show cause, a question has been raised whether the petition for review was timely filed and whether this court lost jurisdiction in the case prior to its grant of review on June 18, 1987. Although neither party has questioned our jurisdiction, we have considered the matter on our own motion.

We conclude that the exception in rule 24(a) is not applicable to this case. The statutory provisions governing petitions for an extraordinary writ of mandate contemplate that when a Court of Appeal considers such a petition, the court will either (1) deny the petition summarily; (2) grant a peremptory writ in the first instance without a hearing, after compliance with the procedure set forth in *Palma* v. *U.S. Industrial Fasteners, Inc.* (1984) 36 Cal.3d 171, 178-180 [203 Cal.Rptr. 626, 681 P.2d 893]; or (3) grant a hearing on the merits by issuing an alternative writ or order to show cause. (See §§ 1085, 1087, 1088. See generally *Palma, supra,* 36 Cal.3d at pp. 177-180; 8 Witkin, Cal. Procedure (3d ed. 1985) Extraordinary Writs,§§ 165, 170, 196, pp. 801, 803-804, 824; Cal. Civil Writ Practice (Cont.Ed.Bar 1987) § 10.25, p. 407.) In our view, rule 24(a)'s exception to the ordinary 30-days-after-filing date of finality was intended to apply only to summary denials of writ petitions by the Court of Appeal, and not to cases—such as this case—in which the Court of Appeal sets a writ matter for oral argument, hears oral argument and resolves the matter by full written opinion. (See 8 Witkin, Cal. Procedure, Extraordinary Writs, *op. cit. supra,* §§ 212, 213, at pp. 838-839.)

In order to fulfill the purposes of rule 24(a) and to prevent the provisions of the rule's exception from becoming an unconscionable trap for the unwary, we conclude that the order of the Court of Appeal setting this matter for oral argument must properly be treated as the issuance of "an alternative writ or order to show cause" for purposes of rule 24(a). Indeed, the Internal Operating Practices and Procedures of the Court of Appeal, Fourth Appellate District, Division One, which is involved here, suggests that oral argument in an original writ proceeding will be ordered only after an alternative writ or order to show cause is issued. (Ct. App., 4th Dist., Div. 1, Internal Operating Practices & Proc., IV, Original Proceeding [West's Cal. Rules of Court (State ed. 1990) pp. 725-726].) Here, it is apparent that the Court of Appeal itself proceeded on the assumption that

the normal rule of finality was applicable to its decision, because it permitted Bay and Bowen to file a petition for rehearing and disposed of that petition on the merits, which would not have been permissible had the Court of Appeal decision been final as to that court immediately. (See rule 24(a) ["[w]hen a decision of a reviewing court is final as to that court, it is not thereafter subject to modification or rehearing by that court . . . . "].) Under these circumstances, we find it appropriate to treat the order setting this matter for oral argument before the Court of Appeal as the equivalent of an order issuing an alternative writ or order to show cause for purposes of rule 24(a).[7] Accordingly, the petition for review was timely filed and we have jurisdiction in this matter.[8]

---

[7] The setting in which the jurisdictional question is presented in this case is clearly distinguishable from that presented in two criminal cases, *People* v. *King* (1978) 22 Cal.3d 12 [148 Cal.Rptr. 409, 582 P.2d 1000], and *People* v. *Pendleton* (1979) 25 Cal.3d 371 [158 Cal.Rptr. 343, 599 P.2d 649], which involved a somewhat related issue. In *King* and in *Pendleton*, the defendant had appealed his conviction to the Court of Appeal and had also filed in that court an original petition for writ of habeas corpus, raising an issue directly related to the appeal. In each case, the Court of Appeal consolidated the habeas petition with the appeal without issuing an order to show cause on the petition, and, thereafter, in its written opinion resolving the appeal, denied or dismissed the habeas petition in the opinion's dispositive order.

In both cases, we granted a hearing after the Court of Appeal decision, purporting to transfer both the appeal and the petition for habeas corpus to this court. In each case, our ultimate opinion on the appeal effectively resolved the substantive issue presented by the related habeas petition. But in each opinion we concluded in a footnote that because the Court of Appeal had not issued an order to show cause on the habeas petition, that court's dispositive order denying or dismissing the habeas petition had, under rule 24(a), become final immediately after filing, and the petition for review, which had been filed according to the deadlines applicable to the appeal, had not been timely as to the habeas petition. (*People* v. *King, supra*, 22 Cal.3d 12, 27, fn. 7; *People* v. *Pendleton, supra*, 25 Cal.3d 371, 382-383, fn. 2.)

After *King* and *Pendleton*, considerable confusion continued to arise from the fact that under rule 24(a), as construed in those decisions, a criminal appeal and a consolidated habeas petition that had been resolved in a single opinion frequently became final on different dates for the purposes of filing a petition for review. To address the problem, rule 24(a) was amended in 1989 to explicitly provide that "the denial of a petition for writ of habeas corpus that is filed on the same day as the decision in a related appeal becomes final as to the Court of Appeal at the same time as the related appeal."

This case is distinguishable from *King* and *Pendleton* in a number of crucial respects. First, because the petition for writ of mandate filed by Bay and Bowen in the Court of Appeal stood alone, and was not related to an appeal or any other proceeding then pending before the Court of Appeal, that court's order setting the matter for argument was more likely to be, and could more reasonably be, viewed by the parties as the equivalent of an alternative writ or order to show cause than was the case with respect to the consolidation order filed by the Court of Appeal in *King* or *Pendleton*. Second, because in both *King* and *Pendleton* the issue raised by the habeas petition was directly related to an issue raised on appeal, this court's application of rule 24(a) in those cases did not have the effect of unexpectedly depriving parties, who had acted reasonably under the circumstances, of this court's review of the merits of the Court of Appeal's decision. The same would not be true if in this case our court, in contravention of the reasonable expectations of the parties and the Court of Appeal, were to interpret rule 24(a) in a manner that rendered the petition for review untimely.

[8] To avoid any possible confusion, in the future all Courts of Appeal should follow the contemplated statutory procedure by issuing an alternative writ or order to show cause before setting a writ matter for oral argument.

■ The second procedural question concerns whether events occurring after Bay and Bowen filed their writ petition in the Court of Appeal have rendered this matter moot. As we have explained, the proceeding before us is a writ proceeding challenging a pretrial order that found Home's settlement to be in good faith and dismissed Bay's and Bowen's indemnity action against Home. Bay and Bowen filed this proceeding immediately after the trial court granted Home's motion. After the petition was filed, the Court of Appeal stayed all further proceedings on the indemnity claim, but permitted the underlying action by plaintiffs against Bay and Bowen to go forward to trial.

After the parties to the writ proceeding had filed several rounds of briefs in the Court of Appeal, and after the Court of Appeal had notified the parties that it was setting the case for oral argument, the parties informed the Court of Appeal that the trial of plaintiffs' action against Bay and Bowen had been completed and that the jury had found in favor of Bay and Bowen and judgment had been entered on the jury verdict.

A question has been raised whether this development renders this proceeding moot. Bay and Bowen argue that the proceeding is not moot. We agree.

It is true, of course, that in light of the subsequent jury verdict in their favor, Bay and Bowen have paid no damages to plaintiffs that they need to recover from Home through an indemnity action. Bay and Bowen, however, continue to have a substantial economic interest in going forward with their indemnity claim, because they are seeking to recover, as part of their claim, the attorney fees and costs that they expended in defending the initial action.

Section 1021.6 permits an indemnitee to recover such attorney fees in an implied indemnity action under specified circumstances,[9] and *Bear Creek Planning Co.* v. *Title Ins. & Trust Co., supra,* 164 Cal.App.3d 1227, 1244-1245 holds that the provisions of section 1021.6 apply when, as here, the claim for implied indemnity is based on an implied contractual indemnity theory. (Cf. Civ. Code, § 2778, subd. 3 [indemnity in express indemnification agreement "embraces the costs of defense"].) Furthermore,

_____

[9] Section 1021.6 provides in relevant part: "Upon motion, a court after reviewing the evidence in the principal case may award attorney's fees to a person who prevails on a claim for implied indemnity if the court finds (a) that the indemnitee through the tort of the indemnitor has been required to act in the protection of the indemnitee's interest by . . . defending an action by a third person and (b) if that indemnitor was properly notified of the demand to . . . provide the defense and did not avail itself of the opportunity to do so, and (c) that the trier of fact determined that the indemnitee was without fault in the principal case which is the basis for the action in indemnity . . . ."

*Uniroyal Chemical Co., Inc.* v. *American Vanguard Corp.* (1988) 203 Cal.App.3d 285, 291-297 [249 Cal.Rptr. 787] establishes that a would-be indemnitee may be eligible to recover attorney fees under section 1021.6 even when—again, as here—the indemnitee has been absolved of all liability for the plaintiff's injuries, so long as the indemnitee demonstrates it would have been entitled to indemnity for any judgment that had been rendered against it.

Thus, if, as Bay and Bowen assert, the trial court erred in dismissing their claim for implied contractual indemnity against Home, Bay and Bowen would be entitled to pursue that indemnity claim and perhaps recover their attorney fees under section 1021.6. Accordingly, the jury verdict in Bay's and Bowen's favor does not moot this proceeding.

Having disposed of the threshold procedural questions, we turn to the substantive issues to which the parties' briefs are addressed.

## 2. *Good Faith Settlement*

Bay and Bowen initially contend that the trial court abused its discretion in determining Home's $30,000 settlement was in good faith. If the trial court did abuse its discretion, there would be no need for us to determine whether a good faith settlement bars an indemnity claim based on a theory of implied contractual indemnity. We conclude, however, that the trial court did not abuse its discretion.

In *Tech-Bilt, Inc.* v. *Woodward-Clyde & Associates, supra,* 38 Cal.3d 488, 492-501 (*Tech-Bilt*), we undertook an extensive analysis of the proper interpretation of the good faith settlement requirement in sections 877 and 877.6. Observing that these statutory provisions are generally intended to promote two major goals—the equitable sharing of costs among the parties at fault and the encouragement of settlements (38 Cal.3d at p. 494)—we explained that the good faith requirement is the key to harmonizing these two objectives. As we said: "The good faith provision . . . mandates that the courts review agreements purportedly made under its aegis to insure that such settlements appropriately balance the contribution statute's dual objectives." (38 Cal.3d at p. 494, fn. omitted.)

We also explained in *Tech-Bilt*: "[T]he intent and policies underlying section 877.6 require that a number of factors be taken into account [in determining good faith,] including a rough approximation of plaintiffs' total recovery and the settlor's proportionate liability, the amount paid in settlement, the allocation of settlement proceeds among plaintiffs, and a recognition that a settlor should pay less in settlement than he would if he were

found liable after a trial. Other relevant considerations include the financial conditions and insurance policy limits of settling defendants, as well as the existence of collusion, fraud or tortious conduct aimed to injure the interests of nonsettling defendants. [Citation.] Finally, practical considerations obviously require that the evaluation be made on the basis of information available at the time of settlement. '[A] defendant's settlement figure must *not be grossly disproportionate to what a reasonable person, at the time of the settlement,* would estimate the settling defendant's liability to be.' [Citation.] The party asserting the lack of good faith, who has the burden of proof on that issue (§ 877.6, subd. (d)), should be permitted to demonstrate, if he can, that the settlement is so far 'out of the ballpark' in relation to these factors as to be inconsistent with the equitable objectives of the statute. Such a demonstration would establish that the proposed settlement was not a 'settlement made in good faith' within the terms of section 877.6." (*Tech-Bilt, supra,* 38 Cal.3d at pp. 499-500.)

▮▮▮ Because in this case plaintiffs had sought, at least at one point in the litigation, as much as $1 million in damages for the parking space discrepancy, Bay and Bowen contend that, in applying the *Tech-Bilt* factors, the trial court should have found that Home's $30,000 settlement was "so far 'out of the ballpark'" as to render the settlement not in good faith. We disagree.

There was abundant evidence to suggest that the $1 million figure was grossly exaggerated. Plaintiffs themselves, in their second amended complaint, sought only $350,000 for the parking space shortage. Bay's and Bowen's own expert determined the total loss in value at only $75,000.

More important, the evidence before the trial court provided substantial support for Home's contention that, at most, it bore only minor responsibility for the representations Bay and Bowen had made in marketing the condominium units. As discussed earlier, the evidence presented by Home established that officials of Bay and Bowen knew of the discrepancy in the parking space figure before Bay obtained the second Department of Real Estate report used in marketing the units. Given this evidence, the trial court did not abuse its discretion in finding that Bay and Bowen had failed to demonstrate that the settlement was not in good faith.

3. *Indemnity Claim*

▮▮▮ The principal contention of Bay and Bowen is that even if the trial court properly found that the settlement was in good faith, the court nonetheless erred in dismissing their cross-complaint for indemnity.

As we noted earlier, in the trial court Bay and Bowen maintained that their indemnity claim fell outside the bar of section 877.6, subdivision (c) because it sought total equitable indemnity, and because it sought indemnity on an implied contractual indemnity theory. In *Far West Financial Corp.* v. *D & S Co.* (1988) 46 Cal.3d 796 [251 Cal.Rptr. 202, 760 P.2d 399], we held that section 877.6, subdivision (c) encompasses claims for total, as well as partial, equitable indemnity. Bay and Bowen no longer challenge the trial court's dismissal of their claim for total equitable indemnity. They maintain, however, that the trial court erred in dismissing their claim for implied contractual indemnity, arguing that such a claim should be equated with a claim for express contractual indemnity. Although the appellate decisions are divided on this issue (see *ante*, at p. 1020, fn. 3), our decision in *E. L. White, Inc.* v. *City of Huntington Beach, supra*, 21 Cal.3d 497 (*E. L. White*), supports the trial court's and the Court of Appeal's rejection of this contention by Bay and Bowen.

*E. L. White, supra*, 21 Cal.3d 497, was decided shortly after we first recognized and applied the comparative equitable indemnity doctrine in *American Motorcycle Assn.* v. *Superior Court, supra*, 20 Cal.3d 578. In *E. L. White, supra*, Justice Manuel, writing for a unanimous court, discussed the various sources from which a duty to indemnify could arise under California law: "The obligation of indemnity, which we have defined as 'the obligation resting on one party to make good a loss or damage another has incurred' [citation] may arise under the law of this state from either of two general sources. First, it may arise by virtue of express contractual language establishing a duty in one party to save another harmless upon the occurrence of specified circumstances. Second, it may find its source *in equitable considerations* brought into play *either by contractual language not specifically dealing with indemnification or by the equities of the particular case.* [Citations.]" (*E. L. White, supra*, 21 Cal.3d at pp. 506-507, italics added.)

As this passage indicates, in *E. L. White* we recognized a distinction between an indemnity claim based on an express contract to indemnify, that is, *an express contractual indemnity claim*, and an indemnity claim based on "contractual language not specifically dealing with indemnification" (*E. L. White, supra*, 21 Cal.3d at p. 507), that is, *an implied contractual indemnity claim*. We explained that, unlike express contractual indemnity, implied contractual indemnity is a form of equitable indemnity. (*Ibid.*)[10]

---

[10]Although the implied contractual indemnity doctrine and the implied noncontractual equitable indemnity doctrine arose separately and were sometimes characterized as distinct categories of indemnity (see, e.g., *Rossmoor Sanitation, Inc.* v. *Pylon, Inc.* (1975) 13 Cal.3d 622, 628 [119 Cal.Rptr. 449, 532 P.2d 97]), equitable considerations have always played an inte-

In *E. L. White*, we applied the distinction between express indemnity and equitably based indemnity to the facts presented in a manner that recognized implied contractual indemnity as a form of equitable indemnity subject to comparative principles. *E. L. White* was the last of a series of lawsuits arising out of a construction site accident in which one worker had been killed and another seriously injured. The first lawsuit was brought by the injured worker and the heirs of the deceased worker. The plaintiffs in that case sued both E. L. White, Inc. (the general contractor), and the City of Huntington Beach (the owner of the project).

The city then filed a declaratory judgment action to establish that E. L. White, Inc., had an obligation to indemnify the city. The city based its declaratory relief action on an express indemnity clause contained in its contract with E. L. White, Inc. The trial court, however, found that the accident had resulted, in part, from the "active negligence" of the city's own inspectors. Because the express indemnity clause in question was a "gener-

gral role in defining the scope of the implied contractual indemnity doctrine. (See Note, *Contribution and Indemnity in California* (1969) 57 Cal.L.Rev. 490, 492-493 & fn. 12.)

Before the advent of the comparative indemnity doctrine in *American Motorcycle Assn.* v. *Superior Court, supra*, 20 Cal.3d 578 (*American Motorcycle*), cases applying the then all-or-nothing implied contractual indemnity doctrine recognized the necessity of ameliorating the effect of its all-or-nothing nature by precluding a party from obtaining such indemnity "if his negligence [was] active or affirmative as distinguished from negligence which [was] passive." (See, e.g., *Cahill Bros., Inc.* v. *Clementina Co.* (1962) 208 Cal.App.2d 367, 382 [25 Cal.Rptr. 301]; *Goldman* v. *Ecco-Phoenix Elec. Corp.* (1964) 62 Cal.2d 40, 44 [41 Cal.Rptr. 73, 396 P.2d 377]; *Aerojet General Corp.* v. *D. Zelinsky & Sons* (1967) 249 Cal.App.2d 604, 607-608 [57 Cal.Rptr. 701].) In *American Motorcycle*, we explained that the judiciary's use of terms such as "active or passive," "primary or secondary," or "positive or negative" in indemnity cases in an attempt to arrive at "an appropriate test for determining when the relative culpability of the parties [was] sufficiently disparate to warrant placing the entire loss on one party and completely absolving the other . . . [¶] [had] largely been a futile one." (20 Cal.3d at p. 594.) Furthermore, we recognized that the principal difficulty in the prior indemnity cases "rest[ed] not simply on a question of terminology, but [lay] instead in the all-or-nothing nature of the doctrine itself." (*Id.* at p. 595.) Accordingly, we concluded that the all-or-nothing equitable indemnity rule should be modified to permit one tortfeasor to obtain partial indemnity from other tortfeasors through a comparative indemnity doctrine that permits an equitable apportionment or allocation of loss between multiple tortfeasors. (*Id.* at p. 598; see also *Far West Financial Corp.* v. *D & S Co., supra*, 46 Cal.3d 796, 804, fn. 7.)

In describing implied contractual indemnity as a form of equitable indemnity, our decision in *E. L. White, supra*, 21 Cal.3d 497, implicitly recognized that the rationale of our holding in *American Motorcycle*—modifying equitable indemnity from an all-or-nothing rule to a doctrine permitting an equitable apportionment of loss based on the relative responsibility of the parties—is as applicable to a claim for implied contractual indemnity as it is to a claim for noncontractual equitable indemnity. (See also *Ford Motor Co.* v. *Robert J. Poeschl, Inc.* (1971) 21 Cal.App.3d 694, 699 [98 Cal.Rptr. 702], discussed in *American Motorcycle, supra*, 20 Cal.3d at pp. 595-597; *Kramer* v. *Cedu Foundation, Inc.* (1979) 93 Cal.App.3d 1, 12-13 [155 Cal.Rptr. 552].) When parties have not entered into an express indemnification agreement specifying that one party will bear all of the liability for a loss for which both parties may be partially responsible, the principles of *American Motorcycle* support an apportionment of the loss under comparative indemnity principles.

al" indemnity clause, which did not specifically provide for indemnification for the city's own negligence, the trial court ruled that the city was not entitled to indemnity under the express indemnity provision. (See generally *Rossmoor Sanitation, Inc.* v. *Pylon, Inc., supra,* 13 Cal.3d 622, 628.) The trial court's ruling was affirmed on appeal.

The *E. L. White* case decided by this court (*supra,* 21 Cal.3d 497) was a separate appeal from a judgment against E. L. White, Inc., rendered in a subsequent indemnity action it brought against the city. In that action, E. L. White, Inc., sought "indemnity and equitable contribution," for the damages it had paid "caused by [the city's] active negligence." (21 Cal.3d at pp. 503-504.) In response, the city contended that even if, as the initial proceeding had established, it (the city) was not entitled to indemnity under the express contractual indemnity agreement of the parties, the express indemnity provision nevertheless barred E. L. White, Inc., from seeking indemnity.

We rejected the city's contention and held that E. L. White, Inc., could maintain an action for implied equitable indemnity. (21 Cal.3d at pp. 506-510.) Furthermore, in remanding the matter for trial of the indemnity claim, we held that the indemnity claim was to be determined "in light of the teaching set forth in our recent decision in *American Motorcycle Assn.* v. *Superior Court* . . . ." (21 Cal.3d at p. 510.) *American Motorcycle,* of course, held that a party's liability for equitable indemnity is based on its proportional share of responsibility for the damages. (20 Cal.3d at p. 598.)

*E. L. White, supra,* 21 Cal.3d 497, thus supports the Court of Appeal decisions in *IRM Corp.* v. *Carlson, supra,* 179 Cal.App.3d 94, 109-110, and *Stratton* v. *Peat, Marwick, Mitchell & Co., supra,* 190 Cal.App.3d 286, 291-292, which hold that under section 877.6, subdivision (c), a good faith settlement relieves a settling defendant from a further claim for indemnity based on an implied contractual indemnity theory. Both *IRM Corp.* and *Stratton* recognize that in *E. L. White* this court viewed a claim for implied contractual indemnity as a form of equitable indemnity, subject to the comparative indemnity principles established in *American Motorcycle.* ▮▮ ▮ ▮ ▮ Under section 877.6, subdivision (c), such an indemnity claim, like other equitable indemnity claims, may not be pursued against a party who has entered into a good faith settlement.[11] The two

---

[11] Although Bay and Bowen assert that a claim for implied contractual indemnity is not barred by a good faith settlement because the language of section 877.6, subdivision (c) does not explicitly refer to such a claim but instead refers to indemnity claims which are "based on comparative negligence or comparative fault" (see *ante,* at p. 1019, fn. 2), in our recent decision in *Far West Financial Corp.* v. *D & S Co., supra,* 46 Cal.3d 796, we explained that our prior cases establish that " 'the term "equitable apportionment or allocation of loss" may be

Court of Appeal decisions that reached a contrary conclusion (*County of Los Angeles* v. *Superior Court, supra,* 155 Cal.App.3d 798, and *Bear Creek Planning Com.* v. *Title Ins. & Trust Co., supra,* 164 Cal.App.3d 1227) failed to analyze our *E. L. White* decision properly.[12]

Our conclusion that a good faith settlement bars a claim for implied contractual indemnity is not at all inconsistent with the principle that such a settlement would not preclude an indemnity action based on an express indemnity agreement. (See *C. L. Peck Contractors* v. *Superior Court, supra,* 159 Cal.App.3d 828, 834.) ▮ As the *C. L. Peck* court observed, neither section 877.6 nor *American Motorcycle, supra,* 20 Cal.3d 578, limits the authority of parties voluntarily to enter into express indemnification agreements. Such agreements often provide an efficient means of allocating responsibility. When an indemnitee under such an agreement reasonably relies on express terms in the agreement in conducting its affairs, it would be unfair to permit a party that has agreed to indemnify to escape its express contractual obligations by entering into a partial settlement.

These considerations do not apply, however, when a settling defendant has not entered into an indemnification agreement with the nonsettling defendant, and the nonsettling defendant's claim for indemnity is based on "equitable considerations brought into play . . . by contractual language not specifically dealing with indemnification." (*E. L. White, supra,* 21 Cal.3d 497, 507.) The contention that a claim for *implied* contractual indemnity should be equated with a claim for *express* contractual indemnity cannot be reconciled with case law involving express indemnification clauses in circumstances where both the indemnitor and the indemnitee bear some responsibility for the loss.

---

more descriptive than "comparative fault" ' " (46 Cal.3d at p. 804, fn. 7 [quoting *Daly* v. *General Motors Corp.* (1978) 20 Cal.3d 725, 736 (144 Cal.Rptr. 380, 575 P.2d 1162)]), and we held that the language used in section 877.6 encompasses all claims for equitable indemnity. (*Far West Financial Corp., supra,* 46 Cal.3d at p. 817.)

[12] In *County of Los Angeles, supra,* 155 Cal.App.3d 798, the Court of Appeal cited *E. L. White, supra,* 21 Cal.3d 497, as the sole support for its conclusion that section 877.6, subdivision (c) "do[es] not operate to bar otherwise valid claims for express or implied indemnity arising out of a contractual relationship." (155 Cal.App.3d at p. 803.) The *County of Los Angeles* court failed to recognize, however, that *E. L. White* had drawn a distinction between an indemnity claim based on an express indemnity agreement and an indemnity claim "brought into play . . . by contractual language not specifically dealing with indemnification" (*E. L. White, supra,* 21 Cal.3d at p. 507), and had categorized implied contractual indemnity as a form of equitable indemnity.

In *Bear Creek Planning Com., supra,* 164 Cal.App.3d 1227, the Court of Appeal did not discuss or cite the *E. L. White* decision.

The decisions in *County of Los Angeles* v. *Superior Court, supra,* 155 Cal.App.3d 798, and *Bear Creek Planning Com.* v. *Title Ins. & Trust Co., supra,* 164 Cal.App.3d 1227, are disapproved to the extent they are inconsistent with the views expressed in this opinion.

██ As our earlier discussion of the factual background of *E. L. White*, *supra*, 21 Cal.3d 497, demonstrates, even when parties have entered into an express indemnification agreement, an indemnitee's culpability may still affect its right to obtain indemnity. As we said in *E. L. White*: "[W]hereas the parties to an express indemnity provision may, by the use of sufficiently specific language, establish a duty in the indemnitor to save the indemnitee harmless from the results of even *active* negligence on the part of the latter [citations], in the absence of this a provision will be construed to provide indemnity to the indemnitee only if he has been no more than *passively* negligent. [Citation.] [And][e]ven an indemnitee who has been only *passively* negligent may be precluded from indemnification if the contractual provision agreed upon provides indemnity only for liabilities resulting from acts of the indemnitor and not from those of others." (21 Cal.3d at p. 507, italics in original, citations and fn. omitted; see also *Rossmoor Sanitation, Inc.* v. *Pylon, Inc.*, *supra*, 13 Cal.3d 622, 628-633; *Gonzales* v. *R. J. Novick Constr. Co.* (1978) 20 Cal.3d 798, 809-810 [144 Cal.Rptr. 408, 575 P.2d 1190].) Thus, while parties remain free to enter into contractual agreements providing for total indemnity, governing case law seeks to assure that, when they do, the contractual language is sufficiently specific to alert the potential indemnitor to the full scope of its obligation.

██ When an indemnity claim is based on an implied contractual indemnity theory, however, there is no written indemnification clause to which the parties or the court may refer. As a consequence, if, as Bay and Bowen contend, we were to consider a claim for implied contractual indemnity as analogous to a claim for express contractual indemnity, an implied contractual indemnity claim could accord an indemnitee greater rights than it would have under an express indemnification contract. This anomaly would arise because in an implied indemnity situation a court could not apply the rules requiring specificity in express indemnification clauses. ██ ██ ██ ██ Thus, the legal rules applicable to the interpretation of express indemnification contracts provide further support for the conclusion that a claim for implied contractual indemnity is a form of equitable indemnity subject to the rules governing equitable indemnity claims.[13]

---

[13] The special legal principles governing express contractual indemnification provisions also refute any suggestion that Bay's and Bowen's claim against Home should be analyzed as a claim for ordinary contract damages rather than as a claim for implied contractual indemnity. Although Bay's and Bowen's claim against Home rested on Home's alleged breach of an implied warranty in the contract for the sale of the property from Home to Bay (see *ante*, at p. 1021, fn. 4), Bay and Bowen were not seeking to recover from Home the ordinary damages recoverable for breach of contract (see Civ. Code, § 3300), but instead were asserting that if they were held legally responsible for damages in the underlying action on any of the numerous theories which the plaintiffs in that action had pursued, *those damages* should be entirely shifted to Home. As such, Bay's and Bowen's claim represented a classic claim for indemnity,

Finally, it should be noted that considering a claim for implied contractual indemnity as a form of equitable indemnity does not leave the nonsettling defendant without substantial protection. In a series of decisions beginning with *Tech-Bilt, supra,* 38 Cal.3d 488, we have emphasized that a settlement will be in "good faith" under section 877.6, subdivision (c) *only* if the trial court determines it to be within the reasonable range of the settling defendant's proportionate liability. Such a determination provides assurance to a nonsettling defendant that a settling defendant will be relieved from claims for equitable indemnity only if the nonsettling defendant will receive the benefit of a setoff that does not leave it to bear a grossly disproportionate share of liability. (See *Far West Financial Corp.* v. *D & S Co., supra,* 46 Cal.3d 796, 814-816; *Abbott Ford, Inc.* v. *Superior Court, supra,* 43 Cal.3d 858, 874.)

■■■ In evaluating the settling defendant's potential proportionate liability for purposes of this determination of good faith, the trial court must take into account any contractual relationship between the settling and nonsettling defendants, and must consider how each party's performance of its contractual obligations relates to its share of liability. Thus, if the trial court finds that the settling defendant rather than the nonsettling defendant is primarily responsible for the plaintiff's damages because the loss is largely attributable to the settling defendant's failure to properly fulfill its contractual obligations, the court should find the settlement in good faith only if the settlement requires the settling defendant to bear an appropriate share of the damages and leaves the nonsettling defendant with a remaining liability that is not grossly disproportionate to its own responsibility for the loss. (Cf. *Far West Financial Corp.* v. *D & S Co., supra,* 46 Cal.3d 796, 815-816.) Indeed, if the trial court concludes that the nonsettling defendant's liability to the plaintiff is wholly attributable to the settling defendant's

---

to which the principles of express contractual indemnity and implied contractual indemnity have traditionally been applied. (See, e.g., Civ. Code, § 2772 et seq.; *Rossmoor Sanitation, Inc.* v. *Pylon, Inc., supra,* 13 Cal.3d 622, 627-628; *Cahill Bros., Inc.* v. *Clementina Co., supra,* 208 Cal.App.2d 367, 375-376. See generally 5 Witkin, Summary of Cal. Law (9th ed. 1988) Torts, §§ 89-104, pp. 162-180.) Because an indemnity claim presupposes that the party seeking indemnity has been properly found, on some theory, to be liable for a third party's injuries (see, e.g., *Molko* v. *Holy Spirit Assn.* (1988) 46 Cal.3d 1092, 1127-1128 [252 Cal.Rptr. 122, 762 P.2d 46]), the legal principles governing such a claim recognize the propriety of taking into account the relative culpability of the party seeking indemnity in determining whether such damages should properly be shifted to another party. (*Rossmoor Sanitation, Inc., supra,* 13 Cal.3d at pp. 628-633; *Cahill Bros., Inc., supra,* 208 Cal.App.2d at pp. 380-383.)

The dissent's argument that application of section 877.6, subdivision (c) to a claim for implied contractual indemnity constitutes an unconstitutional impairment of contract (see dis. opn., *post,* at pp. 1044-1045) is similarly untenable. As explained, a party's right to obtain implied contractual indemnity has always been limited by equitable considerations, and the good faith settlement requirement of section 877.6, subdivision (c) protects the substantive principles embodied in the implied contractual indemnity doctrine. (See *post,* at pp. 1034-1035.)

contractual breach, the court may decline to find a settlement in good faith unless the settlement provides for the dismissal of the action against the nonsettling defendant. (Cf. *id*. at pp. 815, fn. 15, & 816, fn. 17.) The trial court's obligation to take into account such considerations in making its good faith determination serves to ensure that a nonsettling defendant will receive the benefit of the substantive loss allocation principles embodied in the implied contractual indemnity doctrine.

CONCLUSION

In sum, we conclude that the trial court properly found that Home's settlement was a good faith settlement under section 877.6, subdivision (c), and that the settlement barred Bay's and Bowen's claim against Home for implied contractual indemnity.

The judgment of the Court of Appeal is affirmed.

Mosk, J., Broussard, J., and Panelli, J., concurred.

**LUCAS, C. J.**—I concur, but I write separately regarding the application of California Rules of Court, rule 24(a). As the majority notes, rule 24(a) contains an exception to the usual rule that a Court of Appeal decision becomes final 30 days after filing: "the decision becomes final as to that court immediately after filing upon the denial of a petition for a writ within its original jurisdiction or a writ of supersedeas, *without issuance of an alternative writ or order to show cause*." (Italics added.) In this case, no alternative writ or order to show cause issued. Although I agree with the majority's result on this question in this case, I cannot join in concluding that a Court of Appeal order setting a case for oral argument generally may serve as the equivalent of an alternative writ or order to show cause.

Although we have deemed issuance of a peremptory writ in the first instance a "rarity" (*Palma* v. *U.S. Industrial Fasteners, Inc.* (1984) 36 Cal.3d 171, 179 [203 Cal.Rptr. 626, 681 P.2d 893]), the Court of Appeal division here apparently follows a practice of not issuing alternative writs or orders to show cause as a matter of course. In *Palma, supra,* we explored the role of the issuance of an alternative writ and of the notice required when issuance of a peremptory writ in the first instance has been requested and is being contemplated. (36 Cal.3d at pp. 179-180.) As we observed, the alternative writ's issuance "conveys a tentative opinion of the court that a peremptory writ might be in the offing, while [a request for peremptory writ] reflects merely the hopes of a litigant." (*Id.*, at p. 179.) We observed that "in lieu of an alternative writ, the Court of Appeal is authorized by [Code of Civil Procedure] section 1088 to issue a peremptory writ in the

first instance, thus dispensing with the need to await the filing of a return, *oral argument and the preparation of an appellate opinion.*" (*Id.*, at p. 178, fn. omitted, italics added.)

Despite these clearly drawn distinctions, since at least August 10, 1982, rule 3 of the Local Rules of the Fourth Appellate District has expressly recited that "Division One will accept for filing only those petitions for writs of mandate and prohibition which pray solely for a peremptory writ. If meritorious, upon due notice by petitioners, the court can grant them in the first instance. *The court will not accept for filing petitions praying for alternative writs.*" (Ct. App., Fourth Dist., Local Rules, rule 3 [West's Cal. Rules of Court (State ed. 1990) p. 684], italics added.) Appellants who seek extraordinary relief in the Fourth Appellate District thus enter a separate land with independent rules whose singular nature causes the very problem with which we are here confronted.

Although the applicable local rules clearly forbid filing of requests for alternative writs or orders to show cause, the Internal Operating Practices and Procedures of Division One of the Fourth Appellate District expressly provide that when a petition for writ is filed and a response received or time therefor has elapsed, "the writs attorney will prepare a written presentation to the panel of judges to determine if the matter should be made a cause by issuing an alternative writ, order to show cause, or, in appropriate cases, whether a peremptory writ should issue in the first instance. [¶] If the matter becomes a cause, it will be assigned to a member of the panel for the preparation of an opinion . . . . [¶] Once the writ has been assigned to a judge . . . , it will be placed on calendar if oral argument is desired by the court or by the parties." (Ct. App., 4th Dist., Div. 1, Internal Operating Practices & Proc., IV, Original Proceedings [West's Cal. Rules of Court (State ed. 1990) pp. 725-726].) In this case, of course, no peremptory writ was issued. The only provision for calendaring writ matters contemplated in the Internal Operating Practices and Procedures indicates that a matter becomes a "cause" only on issuance of an alternative writ or order to show cause and will be calendared only after becoming a cause.

This confusion about the effect of an order scheduling oral argument was further exacerbated by the Court of Appeal's consideration of the merits of a petition for rehearing. Rule 24 of the California Rules of Court provides that "When a decision of a reviewing court is final as to that court, it is not thereafter subject to modification or rehearing by that court . . . ." The Court of Appeal's action here further muddied the procedural waters.

In my view, the fault lies not so much with the parties as with the Court of Appeal because of its failure to conform its practices with those required

statewide by the general procedures and rules governing writ practice. (See *Palma, supra,* 36 Cal.3d at pp. 177-178 [describing exercise of writ jurisdiction in Court of Appeal].) Because the confusion was engendered by inconsistent and incompatible practices and rules by the court, I concur with the majority's conclusion that we have jurisdiction in this case. It appears it would have been a futile, if not fatal, gesture for the petitioner to have filed a request for issuance of an alternative writ or order to show cause. The court's action in calendaring the matter made it appear as if the matter had become a "cause"—and the court's own internal operating procedures indicated that a writ matter became a cause only upon issuance of an alternative writ or order to show cause.[1] Under the circumstances, I therefore agree that we must treat the proceeding here as if an alternative writ or order to show cause had issued and the petition for review thus was timely filed.

Where I depart from the majority is in its intimation that the Court of Appeal's procedures here may be acceptable, albeit not preferable. Thus, the majority suggests that "To avoid any possible confusion, in the future all Courts of Appeal should follow the contemplated statutory procedures by issuing an alternative writ or order to show cause before setting a writ matter for oral argument." (See maj. opn., *ante,* at p. 1025, fn. 8.) Instead, in my view, the procedures described in the local rules precluding requests for alternative writs or orders to show cause are inconsistent with statute and rule and should be disapproved. The language of rule 24 of the California Rules of Court should be read according to its plain meaning: a denial of a petition for writ when no alternative writ or order to show cause has been issued is final immediately.[2] Our holding here must stand for the proposi-

---

[1] Reading the two applicable local rules together leaves one to ponder what purpose is served by a refusal to accept petitions requesting alternative writs. It appears from its internal operating procedures that the court contemplates issuing alternative writs and holding argument when it wishes to consider matters fully on their merits before deciding whether or not to issue a writ. If it wishes to issue a peremptory writ in the first instance, it can give *Palma* notice and do so. If it wishes to deny summarily, it may do so as well. The preclusion of alternative writ prayers apparently was not intended to limit the court's issuance of such writs in undefined instances. The court's action here in scheduling oral argument without issuance of an alternative writ amounted in effect to an unfortunate and unnecessary hybrid of alternative writ procedures and *Palma* notice procedures.

[2] The majority describes another situation in which rule 24(a) had a harsh and anomalous effect. (Maj. opn., *ante,* at p. 1025, fn. 7.) Under the rule, a criminal appeal and consolidated habeas corpus petition had different dates of finality for purposes of filing a petition for review. The existing language was not read "creatively" to cure the problem; instead, rule 24(a) was amended to expressly provide the same date of finality.

An amendment to the rule could cover the situation faced by petitioner here and provide that when the Court of Appeal holds argument and issues a full written opinion, the decision is final 30 days after the filing of the opinion as is true in an ordinary appeal. I am not convinced such an amendment is necessary. Confusion can be avoided by simply adhering to the plain language of the rule and by requiring the lower courts, in their local procedures, to adopt methods that comport with generally applicable statutes and rules.

tion that, henceforth, parties and lower courts should be on notice pursuant to rule 24(a) that denial of a petition for writ in which no alternative writ or order to show cause has issued requires that a petition for review be filed within 10 days of the filing of the denial, regardless of the length or complexity of any Court of Appeal opinion or order that may be issued in regard thereto.

Eagleson, J., and Arabian, J., concurred.

**EAGLESON, J.,** Dissenting.—Although I have joined the Chief Justice's concurring opinion to reflect my concern with the majority's treatment of the jurisdictional issue in this case, I find it necessary to write separately to express my further disagreement with the majority's decision of the underlying indemnity issue.

The majority concludes a settlement determined by a trial court to be in good faith under Code of Civil Procedure section 877.6 bars a claim for implied contractual indemnity.[1] Duly considered, the facts reveal that the majority frames the issue too broadly. The indemnity claim in this case has two components: equitable indemnity and implied contractual indemnity. Both are based on alleged misrepresentations by Home Capital Corporation (Home) as to the number of parking spaces at the Mission Village Condominium Project. Bay Development, Ltd. (Bay), and Bowen Company (Bowen) allege in their cross-complaint for indemnity that Home's misrepresentations were a breach of an implied warranty (as to the number of available parking spaces) in the *contract of sale* under which Bay and Bowen purchased the condominium project from Home. The cross-complaint alleges that Bay and Bowen's liability, if any, to the condominium purchasers is the result of Home's *breach of its contract* with Bay and Bowen. Their claim is *not* based on an implied promise to indemnify, but on an implied warranty to provide a specified number of parking spaces. (Bay and Bowen concede their claim for equitable indemnity is barred by the settlement.)

There is a significant difference between a contractual promise to indemnify and a contractual promise to perform in a certain way. The majority does not adequately reflect this distinction. Its holding will preclude a party to a contract from recovering for breach of contract when the breaching party has entered into a good faith settlement with a third party. The majority opinion will mandate this result even when the breach was of an express contractual provision to perform in a specified manner. I find no support for this conclusion in the statute or common sense.[2]

---

[1] All further section references are to the Code of Civil Procedure unless otherwise indicated.

[2] Because the majority opinion will bar recovery for breach of a contractual promise to perform, whether express or implied, the fact the warranty in this case was implied is not sig-

## A. *Statutory language*

The majority does not acknowledge that we are confronted with nothing more than a question of statutory construction—the scope of section 877.6, subdivision (c).[3] Faced with this question, we must begin with the fundamental rule that our primary task is to determine the Legislature's intent. (*Brown* v. *Kelly Broadcasting Co.* (1989) 48 Cal.3d 711, 724 [257 Cal.Rptr. 708, 771 P.2d 406].) It is axiomatic that we turn first to the statute's words for the answer. (*Ibid.*) As with its statement of the key facts, however, the majority opinion merely notes the controlling statute in a footnote with no consideration of the statutory language. (Maj. opn., *ante*, at p. 1019, fn. 2.)

Section 877.6(c) is unambiguous. It applies to contribution and indemnity claims "*based on comparative negligence or comparative fault.*" (Italics added.) Bay and Bowen's claim is based on neither comparative negligence nor comparative fault. Their claim is based on an alleged breach of contract, i.e., an implied warranty. The majority opinion assumes that section 877.6(c) applies to such a claim despite the statutory language to the contrary. I believe due consideration should be given to this threshold, potentially dispositive issue.

The application of section 877.6(c) to contract actions is correct only if an action for breach of contract is properly characterized as being a claim based on "comparative fault." I am unaware of any support for that characterization. We recently reiterated the principle that "The distinction between tort and contract is well grounded in common law, and divergent objectives underlie the remedies created in the two areas." (*Foley* v. *Interactive Data Corp.* (1988) 47 Cal.3d 654, 683 [254 Cal.Rptr. 211, 765 P.2d 373].) Indeed, the distinction is hornbook law. Actions based on tort have long been referred to as being "ex delicto," meaning in modern phraseology that they are based *on fault.* (See Black's Law Dict. (5th ed. 1979) p. 509, col. 1.) Actions for breach of contract have been denominated as being "ex contractu"—from or out of a contract—to distinguish them from actions based on fault, i.e., tort actions. (See Black's Law Dict., *supra*, p. 508, col. 1; see also *Foley* v. *Interactive Data Corp.*, *supra*, 47 Cal.3d at p. 690.)

In *Bear Creek Planning Com.* v. *Title Ins. & Trust Co.* (1985) 164 Cal.App.3d 1227 [211 Cal.Rptr. 172], the court correctly explained that "An action for implied contractual indemnity is not a claim for contribu-

---

nificant. Moreover, if a party seeking recovery has proved the existence of a contractual provision, his right to recover does not depend on whether the provision was express or implied.

The majority acknowledges that settlement does not bar enforcement of an express indemnity provision. (Maj. opn., *ante*, at pp. 1031-1032.)

[3] For convenience, I will hereafter refer to section 877.6, subdivision (c) as section 877.6(c).

tion from a joint tortfeasor; it is not founded upon a tort or upon any duty which the indemnitor owes to the injured third party. It is grounded upon the indemnitor's breach of duty *owing to the indemnitee* to properly perform its contractual duties." (*Id.*, at pp. 1238-1239, italics in original; accord *County of Los Angeles* v. *Superior Court* (1984) 155 Cal.App.3d 798, 803 [202 Cal.Rptr. 444].) Likewise here, Bay and Bowen's claim for indemnity is based on contract, not comparative fault, and is therefore not within the scope of section 877.6(c).[4]

### B. *Prior court decisions*

The majority opinion relies heavily on *E. L. White*, Inc. v. *City of Huntington Beach* (1978) 21 Cal.3d 497 [146 Cal.Rptr. 614, 579 P.2d 505] (hereafter *White*), as support for the conclusion that implied contractual indemnity is the same as equitable indemnity. Properly read, *White* does not support that conclusion. The *White* court noted "two basic forms of indemnity." (*Id.*, at p. 507.) "First, it may arise by virtue of express contractual language establishing a duty in one party to save another harmless upon the occurrence of specified circumstances. Second, it may find its source in equitable considerations brought into play either by contractual language not specifically dealing with indemnification or by the equities of the particular case." (*Id.*, at pp. 506-507.) This observation fails in four respects to support the majority opinion.

First, unlike in the present case, the indemnity claim in *White* was *not* based on a warranty of performance. The claim arose out of an accident in which a trench collapsed onto two workers. Shortly before the accident, a city inspector and engineer visited the site several times and observed a safety order violation, but they took no action to compel compliance. As the court noted, the indemnity claim was for damages caused by the city's "active negligence." There was no allegation the city had any *contractual* duty to inspect the work site or to ensure its safety. In the present case, the claim is founded on a warranty as to the number of parking spaces.

Second, the *White* court's observation was made in response to an argument that, because an express indemnity provision did not apply to the facts before the court, there was no other basis for indemnity. The quoted passage in *White* (21 Cal.3d at pp. 506-507) rejected that argument and made clear that a right to indemnity can be found in other sources: (1) contractual language *or* (2) equities of the case. Unlike the majority, the *White* court did

---

[4] The majority contends the phrase "equitable apportionment or allocation of loss" may be more descriptive than section 877.6(c)'s use of the phrase "comparative negligence or comparative fault." (*Ante*, p. 1029, fn. 10.) The majority's phrase is perhaps more descriptive, but it is not the language employed by the Legislature.

not purport to decide those two sources are the same. No such issue was before the court. The majority fails to acknowledge the context in which the *White* court made its observation.

Third, a study of the authorities cited in *White* makes clear that the court's reference to two forms of indemnity was meant to indicate merely a distinction between express and implied indemnity, not a conclusion that all implied indemnity is the same. (As noted above, the latter issue was not before the court.) In *Rossmoor Sanitation, Inc.* v. *Pylon, Inc.* (1975) 13 Cal.3d 622 [119 Cal.Rptr. 449, 532 P.2d 97], decided shortly before *White*, we expressly identified *three* sources of indemnity: This "obligation [indemnity] may be [1] expressly provided for by contract . . . [2] it may be implied from a contract not specifically mentioning indemnity . . . or [3] it may arise from the equities of particular circumstances . . . ." (*Id.,* at p. 628, citations omitted.) The two law review articles cited in *White, supra,* 21 Cal.3d at page 507, also distinguish between implied contractual indemnity and implied *non*contractual indemnity. (Note, *Contribution and Indemnity in California* (1969) 57 Cal.L.Rev. 490, 492, fn. 12; Conley & Sayre, *Indemnity Revisited: Insurance of the Shifting Risk* (1978) 22 Hastings L.J. 1201.) In light of the *White* court's citation to these authorities, one cannot reasonably read the *White* decision to mean that implied contractual indemnity is the same as implied *non*contractual indemnity.

Fourth, the majority reads too much into the statement that an indemnity claim "may find its source in equitable considerations brought into play . . . by contractual language not specifically dealing with indemnification . . . ." (*White, supra,* 21 Cal.3d at p. 507.) As noted above, there was no claim in *White* of breach of any specific contractual provision to perform in a certain manner. Thus, if the indemnity claim was to arise from contract, the basis had to be in some general equitable consideration arising from the contractual *relationship*, not from the contract itself. If a putative indemnitee relied on a contract only to show a "general equitable consideration," he would in effect be admitting that the contract does not provide any basis for relief. He would be relying on equity. In that case, his claim could fairly be denominated as being one for equitable indemnity, and I might agree with the majority that the claim would be barred by a good faith settlement under section 877.6. Bay and Bowen, however, do not rely on any such amorphous consideration. They are relying on a specific (albeit implied) warranty.

In short, I find no support in *White, supra,* 21 Cal.3d 497, for the majority's expansive conclusion. The majority treats the issue before us as if it had been clearly resolved in *White*. The issue was not even present. The brief excerpt on which the majority depends so heavily is therefore a slender reed

on which to base its broad holding.[5] Indeed, if the issue had been resolved so clearly in *White*, there was no need for us to grant review in this case.

That *White, supra*, 21 Cal.3d 497, does not mandate the majority's conclusion is demonstrated by the two Court of Appeal decisions the majority disapproves. In *County of Los Angeles v. Superior Court, supra*, 155 Cal.App.3d 798, the court was faced, as in this case, with an indemnity claim based on a specific contractual promise to perform in a certain manner. The court fully considered *White* and concluded that it did not bar the claim. "We find nothing in the underlying purposes of Code of Civil Procedure sections 877 and 877.6 or in the facts of this case to justify impairment of the contract . . . . Further we find nothing in the language or history of the statutes nor in the case law interpreting those statutes which suggest[s] that such a result . . . was ever intended by the Legislature." (155 Cal.App.3d at p. 803.) I agree.

Similarly, in *Bear Creek Planning Com. v. Title Ins. & Trust Co., supra*, 164 Cal.App.3d 1227 (hereafter *Bear Creek*), the court correctly observed the distinction between equitable indemnity based on a mere contractual relationship and recovery based on breach of a contractual promise to perform. The right to implied *contractual* indemnity " 'is predicated upon the indemnitor's breach of such contract, the rationale of the cases being that a contract under which the indemnitor undertook to do work or perform services necessarily implied an obligation to do the work involved in a proper manner and to discharge foreseeable damages resulting from improper performance absent any participation by the indemnitee in the wrongful act precluding recovery.' " (*Id.*, at p. 1237, quoting *Great Western Furniture Co. v. Porter Corp.* (1965) 238 Cal.App.2d 502, 517 [48 Cal.Rptr. 76].)[6] The majority opinion ignores the source of the indemnity claim in this case. The source is contract, not equity. The principles that apply to equitable indemnity are inapposite.

## C. *Conflict with Civil Code section 3300 and other statutes*

The majority's conclusion is especially troubling because it directly conflicts with Civil Code section 3300, which states: "For the breach of an

---

[5] Nor am I persuaded by the two Court of Appeal decisions on which the majority relies. (*IRM Corp. v. Carlson* (1986) 179 Cal.App.3d 94, 109-110 [224 Cal.Rptr. 438]; *Stratton v. Peat, Marwick, Mitchell & Co.* (1987) 190 Cal.App.3d 286, 291-292 [235 Cal.Rptr. 374].) Those decisions, in turn, rely on *White, supra*, 21 Cal.3d 497. As explained above, that reliance is misplaced.

[6] The majority opinion faults the court in *Bear Creek, supra*, 164 Cal.App.3d 1227, for not citing our decision in *White, supra*, 21 Cal.3d 497. As in this case, *White* is inapposite to a claim of implied contractual indemnity, so there was no need for the *Bear Creek* court to discuss the decision. In any event, the court did consider *Rossmoor Sanitation, Inc. v. Pylon, Inc., supra*, 13 Cal.3d 622, the only case on which the *White* court relied.

obligation arising from contract, the measure of damages, except where otherwise expressly provided by this code, is the amount which will compensate the party aggrieved for *all the detriment* proximately caused thereby, or which, in the ordinary course of things, would be likely to result therefrom." (Italics added.) Although this statute has been in its present form for more than a century (since 1873) and is bedrock California contract law, the majority opinion barely mentions it. (Maj. opn., *ante*, at p. 1033, fn. 13.) I believe Civil Code section 3300 is relevant to the issue before us.

Under the majority opinion, a good faith settlement under section 877.6 would bar recovery for breach of contract. This result would conflict with Civil Code section 3300's provision that the injured party is entitled to *all damages* proximately caused by the breach. A brief example illustrates the point: A bolt maker contracts with an aircraft manufacturer to supply bolts. This contract expressly requires that the bolts be of a certain specification. The manufacturer, in turn, contracts with an airline company to deliver an aircraft that meets certain specifications contained in their contract. The bolt maker breaches its contract by supplying nonconforming bolts. The manufacturer incorporates them into an aircraft. As a result, the plane crashes. The victims sue the airline, the manufacturer, and the bolt maker. If the bolt maker enters into a good faith settlement with the victims under section 877.6, the majority opinion will preclude the manufacturer from recovering for the bolt maker's breach of contract. This result conflicts with Civil Code section 3300. If the manufacturer can show that its damages were proximately caused by the component maker's breach of their contract, section 3300 should allow the manufacturer to recover *all* those damages.

The majority opinion also conflicts with California Uniform Commercial Code sections 2714 and 2715, which allow a buyer of goods to recover incidental and consequential damages for a seller's breach of contract. Under the majority's expansive holding, these sections, like Civil Code section 3300, would have no effect if the breaching seller entered into a good faith settlement with an injured third party under section 877.6.

Nothing in section 877.6 suggests the Legislature intended to abrogate Civil Code section 3300 or California Uniform Commercial Code sections 2714 and 2715. All presumptions are against a repeal by implication. (*Western Oil & Gas Assn.* v. *Monterey Bay Unified Air Pollution Control Dist.* (1989) 49 Cal.3d 408, 419 [261 Cal.Rptr. 384, 777 P.2d 157].) Moreover, Civil Code section 3300 states that it governs "except where otherwise

expressly provided by *this* code" (italics added), i.e., the *Civil* Code. Section 877.6 is in the Code of Civil Procedure.[7]

The majority creates an unnecessary conflict between section 877.6 and other statutes. I see no reason to do so.

### D. *Unconstitutional impairment of contract*

Article I, section 9 of the California Constitution states, "A bill of attainder, ex post facto law, or law impairing the obligation of contracts may not be passed." As construed by the majority, section 877.6(c) clearly impairs the obligation of *existing* contracts and therefore runs afoul of the state Constitution.[8] Therefore, even if the majority's construction of section 877.6 were otherwise correct, application of the proposed rule to the contract at issue in this case (or to any other contract existing at the time of our decision) violates article I, section 9. In *County of Los Angeles* v. *Superior Court, supra,* 155 Cal.App.3d 798, the court noted this constitutional restriction as one of the reasons why the court was rejecting the construction of section 877.6 now adopted by the majority. (155 Cal.App.3d at p. 803.) The majority opinion, however, fails even to acknowledge the constitutional restriction.

Absent section 877.6 (as construed by the majority), it is undisputed that Bay and Bowen could maintain an action for the alleged breach of an implied warranty in their contract with Home. Stated simply, they would have a remedy for the breach. We long ago made clear that, "The remedy, where it affects substantial rights, is included in the term 'obligation of contract', and the remedy cannot be altered so as to materially impair such obligations." (*Brown* v. *Ferdon* (1936) 5 Cal.2d 226, 231 [54 P.2d 712]; *County of Los Angeles* v. *Jessup* (1938) 11 Cal.2d 273, 280-282 [78 P.2d 1131].) The majority rule will eliminate entirely any remedy because it precludes Bay and Bowen from recovering damages proximately incurred by Home's breach of contract. We recently referred to the "*inviolate* rights that characterize private contracts." (*Calfarm Ins. Co.* v. *Deukmejian* (1989) 48 Cal.3d 805, 830 [258 Cal.Rptr. 161, 771 P.2d 1247], italics added.) Less than one year later, the majority opinion reflects a view that such rights are not worthy of protection.

---

[7] Aside from the placement of the two statutes in different codes, it is questionable whether the Legislature could limit Civil Code section 3300 by implication in light of its statement that it applies "except where otherwise *expressly* provided." (Italics added; see *Western Oil & Gas Assn.* v. *Monterey Bay Unified Air Pollution Control Dist., supra,* 49 Cal.3d 408, 419, fn. 15.)

[8] The United States Constitution, article I, section 10, contains a similar proscription. Thus, the majority's result is infirm under both the state and federal Constitutions.

To avoid a construction of section 877.6(c) that renders it unconstitutional, the majority should limit its proposed rule to contracts not yet in existence as of the date of our decision.

### E. *Practical effects of the majority decision*

Apparently in recognition of the great potential for unfairness under its rule, the majority advises trial courts they "must take into account any contractual relationship between the settling and nonsettling defendants." (Maj. opn., *ante*, at p. 1034.) I believe the majority's cautionary note is insufficient. For example, the majority opinion states that, when the nonsettling defendant is primarily responsible for the plaintiff's damages, " . . . the court *should* find the settlement in good faith only if the settlement requires the settling defendant to bear an appropriate share of the damages and leaves the nonsettling defendant with a remaining liability that is not grossly disproportionate to its own responsibility for the loss." (Maj. opn., *ante*, at p. 1034, italics added.) This is troublesome in two respects. First, it is a mere suggestion and does not reflect the reality of litigation. There are extreme pressures on trial courts to dispose of as many cases as possible by settlement. Faced with even a remotely colorable claim of good faith, many trial courts will be disposed to view it favorably and approve settlement under section 877.6. Under the majority's "should" language, a trial court can approve a settlement even if the settling defendant does not bear an appropriate share of the damages.

Second, the phrase "appropriate share of the damages" provides no guidance. The term is not defined or even explained. Moreover, where, as in this case, the nonsettling defendant is found to have *no* responsibility for the loss, I do not see how any damages sustained by the nonsettling defendant can be said to be "appropriate." For the same reason, I also question the majority's observation that a trial court "may decline" to find good faith if the nonsettling defendant's liability to plaintiff is wholly attributable to the settling defendant's breach. (Maj. opn., *ante*, at pp. 1034-1035.) I do not see how a trial court could possibly find good faith in that situation. As a matter of logic and fairness, the party without fault should not be required to pay anything. For example, if the breaching party settles with the third party by paying 90 percent of its damages, the nonbreaching party would be liable to the third party for the remaining 10 percent. The majority opinion, however, would allow the trial court to bar the nonbreaching party from recovering this 10 percent from the breaching (settling) party. This result would be grossly and fundamentally unfair. The majority opinion should make clear that the trial court in that situation must not deem a settlement to be in good faith. In short, the majority opinion leaves too much room for grossly unfair results.

The majority opinion also interjects an element of whimsy into contract law, the very essence of which is to allow contracting parties to plan for the future. (Cf. *Phillippe* v. *Shapell Industries* (1987) 43 Cal.3d 1247, 1269 [241 Cal.Rptr. 22, 743 P.2d 1279] [noting the business community's desire for certainty and predictability].) The aircraft bolt example used above helps to illustrate. (See discussion at p. 1043, *ante.*) Assume the aircraft manufacturer incorporates the defective bolts into an aircraft and delivers it to an airline company. The airline has to replace the defective bolts and recovers from the manufacturer for breach of contract. Even if the contract between the manufacturer and bolt maker contains no express indemnity provision, the manufacturer can recover its damages, including the amount paid to the third party purchaser, from the bolt maker for its breach of warranty. This is the result the parties anticipated when they negotiated and entered into their contract, i.e., recovery of damages for a breach of warranty.

Assume, however, the airline does not discover the defective bolts, and the plane crashes. The victims sue the manufacturer, the airline, and the bolt maker. If the bolt maker enters into a good faith settlement with the victims under section 877.6, the majority opinion would preclude the manufacturer from recovering for the breach of its contract with the bolt maker. The manufacturer would be deprived of the benefit of a freely negotiated and bargained-for performance provision in the contract.[9] Thus, whether the manufacturer can recover for breach depends entirely on events beyond its control. In short, the majority will render some contracts illusory. It holds in effect, "Contracts may mean what they say, but then again they may not. It just depends." This ignores the far-reaching effects the majority opinion will have on commercial contracts in California.

---

[9]This result is particularly anomalous because, if the manufacturer had merely been required to replace the bolts (or pay the airline to do so), it could have recovered on its contract with the bolt maker. As a result of the crash, which will give rise to much greater damages, the manufacturer loses any right to recover.