Filed 9/23/15  S.S. v. Super. Court CA1/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| S.S.,<br><br>      Petitioner,<br><br>v.<br><br>THE SUPERIOR COURT OF MENDOCINO COUNTY,<br><br>      Respondent;<br><br>MENDOCINO COUNTY DEPARTMENT OF SOCIAL SERVICES et al.,<br><br>      Real Parties in Interest. | A145809<br><br>(Mendocino County<br>Super. Ct. No. SCUKJVSQ1417099) |

**INTRODUCTION**

S.S., mother of J.B., petitions this court for extraordinary relief from the juvenile court's order of July 2, 2015, terminating her reunification services and setting a permanency planning hearing (Welf. & Inst. Code, § 366.26).[1]  Mother contends the court's finding she was offered reasonable reunification services regarding her mental health needs is not supported by substantial evidence.  We issued an order to show cause on August 13, 2015.  After careful consideration of the record and the parties' contentions, we deny petitioner's request for extraordinary relief on the merits and affirm

---

[1] Unless otherwise indicated, all further statutory references are to the Welfare and Institutions Code.

the juvenile court's orders. We also deny her request for stay of the permanency planning hearing set for October 29, 2015.

## STATEMENT OF HISTORICAL AND PROCEDURAL FACTS

### *Petition and Detention Hearing*

Mother gave birth to J.B. in November 2014. He tested positive at birth for methamphetamine. Mother admitted using methamphetamine before the birth. She also tested positive for methamphetamine. The Mendocino County Health and Human Services Agency (Agency) was notified and the baby was detained at the hospital.

While being interviewed at the hospital, mother stated she had recently relapsed and had been diagnosed with schizophrenia and borderline personality disorder, for which she received weekly shots from "mental health." She said she was seeing an Alcohol and Other Drug Program (AODP) counselor in Laytonville, and "agreed to sign a release of information for the Agency to speak with Mental Health, In Home Supportive Services, AODP, and other community organizations that help[ed] [her] in her everyday life."

A petition pursuant to section 300, subdivision (b) was filed on November 17, 2014, alleging in paragraph (b-1) that mother "has a current substance abuse problem with methamphetamine that inhibits her ability to provide safe and adequate supervision for her child"; in paragraph (b-2), that mother failed to protect her child with adequate medical attention; in paragraph (b-3) that father has similar substance abuse issues; and in paragraph (b)(4) that father is homeless. No allegations addressed mother's self-reported mental health issues.

J.B. was formally detained the next day after an uncontested detention hearing, at which mother appeared.

### *Jurisdiction*

At the uncontested jurisdiction hearing held on December 31, 2014, mother submitted the petition for the court's determination on the social worker's report. The

2

court found true the allegations under paragraphs (b-1), (b-3), and (b-4), and dismissed the allegation under paragraph (b-2). The minor was in foster care.

### Disposition

An uncontested disposition hearing was held on January 15, 2015, at which mother was offered reunification services.[2] The disposition report noted mother had been referred to the Willits Family Center for services including "Intake Support Group, Daily AOD (Alcohol and Other Drugs) Assessment and treatment, random drug testing, housing assistance, parenting classes, as well as staff support by a parent partner and a Social Worker Assistant." Mother was checking in regularly with the social worker and engaging in the recommended services.

Additionally, mother was receiving mental health services at the Willits Family Center and seeing Dr. Garrett every two months at Mental Health in Ukiah. These services included biweekly Prolaxin shots and nightly doses of Risperidone. The Agency was committed to supporting mother in her admitted mental health struggles by "mak[ing] sure she is receiving services from Manzanita Mental Health Services, along with utilizing the services of a Parent Partner, offered by the Agency."

Mother's responsibilities under her case plan required her to "[s]tay free from illegal drugs and show [her] ability to live free from drug dependency" by complying with all required drug tests, participating in and successfully completing a substance abuse assessment at AODP or another approved drug/alcohol treatment program, and following all treatment recommendations.

Mother was also ordered to: "1. Continue to participate in psychiatric medication assessment and follow all medication recommendations by her mental health provider, including receiving her biweekly medications by injection[;] [¶] 2. Attend and successfully complete counseling with a therapist approved by Social Services to address

---

[2] The alleged father, R.B., was denied reunification services.

3

issues specific to [her] mental health diagnosis[;] Participate with the therapist and social worker to develop the treatment plan. Success will be evidenced by: [¶] –A written report of successful completion of the treatment plan. [¶] –90% attendance of the therapy sessions." The six-month review hearing was set for July 2, 2015.

On March 9, 2015, the social worker reported that due to mother's long history of addiction, she had been unable to remain abstinent on her own and was unsuccessful in her substance abuse treatment plan. However, she was eligible and suitable for referral to the Mendocino County Family Dependency Drug Court (FDDC), and she was willing to participate in that program. On March 12, 2015, mother was found eligible for FDDC and ordered to participate in the program. Her case plan was updated to include an FDDC component. The new requirements included signing the FDDC agreement, participating in and successfully completing the FDDC program by graduating from FDDC, attending all court-ordered FDDC hearings and AODP, submitting clean, unadulterated drug and/or alcohol tests on a random basis, maintaining a clean and sober lifestyle, and avoiding new substance abuse-related legal complications.

### Six-Month Review Hearing

The six-month review hearing was held on July 2, 2015. The social worker's report prepared for that hearing detailed the following developments. Between November 17, 2014 and March 23, 2015, mother tested positive for methamphetamine or marijuana, or both, nine times. She tested negative for those substances once, on November 25, 2014. The test on March 23 followed her entry into the FDDC program.

On March 30, 2015, mother was accepted into Women's Recovery Association (WRA) in San Mateo County, completing the 60-day residential treatment program on June 1, 2015. Reports from WRA documented her steady progress. However, on June 3, 2015, mother reported to the drug court judge she had relapsed on alcohol the day before. She reported having one beer, and being unaware alcohol was considered a drug. Subsequent drug testing confirmed she was negative for other substances. Further testing

4

for alcohol showed the sample she submitted was dilute.  She was advised to refrain from consuming all drugs, including alcohol.

Mother failed to appear in drug court on June 10, 2015.  Later that day she tearfully admitted to the social worker she "just gave up" and relapsed on methamphetamine on June 9.  An intervention was scheduled for June 11 between mother, the social worker and the Substance Use Disorder Treatment (SUDT) counselor, but the social worker recommended that mother be terminated from FDDC due to her inability to remain drug free following a 60-day residential treatment program stay.

Throughout this period, mother faithfully maintained her allotted visitation hours with J.B. and engaged appropriately and lovingly with him.

The social worker reported that mother continued to receive mental health services.  Although she missed a June 3 appointment as a result of her relapse and a family crisis, she was seeing Dr. Garrett for psychiatric care and was scheduled to begin Risperidol injections at her next scheduled June appointment.  She was not currently under the care of a therapist, and informed the social worker she preferred to see a therapist of her choosing, Dick Dipman.

The social worker gauged the probability of the minor's return to mother's custody as "unlikely due to the mother's continued methamphetamine use in the beginning of her case, late start in drug treatment, relapse on alcohol and methamphetamine upon completion of a residential drug treatment program, and lack of attendance in parenting education classes."  She recommended termination of services to mother, based on the age of the child and mother's minimal progress in her court-ordered case plan.  These services included referrals to Intake Support Group and SUDT, random drug testing, residential drug treatment, a parent partner for support with housing assistance, bus passes for transportation, parenting education classes, visitation, and "support to follow through with psychological care and medication."

In her statement of reasons leading up to the termination of services recommendation, the social worker again cited "mother's slow engagement in SUDT services and continued use of substances" from the beginning of her case to her entry into residential treatment, and her relapse since completing the treatment program. The social worker did not cite mother's mental health issues, or her failure to see an Agency-approved therapist, as reasons for the recommendation.

At the hearing, social worker Quadrelli was questioned about the Agency's provision of mental health services to mother. Quadrelli was not assigned to the case until late April 2015. She agreed, in terms of identifying issues in this case, that the mental health of the mother was "a concern." The disposition report (written by another social worker ) indicated mother spoke openly about her mental health struggles, and the case plan called for her to attend and successfully complete counseling for her mental health issues with a therapist approved by the Agency. Quadrelli did not personally make any referrals for counseling. No one else from the Agency made any referrals for counseling because mother had been seeing Dr. Garrett for psychiatric treatment prior to the minor's detention. To her knowledge, no one from the Agency contacted Dr. Garrett to determine the scope of his services.

Mother signed releases to allow the social worker to speak with mother's mental health providers, but did not sign a release with respect to Dr. Garrett. It was established by offer of proof that when releases have not been signed, the Agency presumes it is because the parent refused to sign. Quadrelli never asked the mother to sign a release for Dr. Garrett.

Quadrelli knew that when mother was discharged from WRA she was noncompliant with her psychotropic medications. By "noncompliant," Quadrelli meant that mother reported she sometimes forgot to take her oral medications, and when she remembered she doubled the dosage, a strategy which did not work. She had been

6

waiting to get injections again, but that process had gotten "hung up" on the transfer of mother's Medi-Cal from San Mateo (where WRA was located ) back to Ukiah.

Quadrelli's primary focus and concern with respect to mother's mental health was stabilizing her suicidal ideation[3] by getting her to be medication-compliant again. After that, the plan was to begin ongoing and frequent therapy. However, Quadrelli admitted regular counseling could have assisted in stabilizing mother's mental health and, in fact, she *did* offer to provide mother a referral to an Agency-approved counselor sometime between June 10 and June 17. Mother declined the offer, stating she had already set up an appointment with a therapist, Dick Dipman, who would accept Medi-Cal when it transferred from San Mateo back to Ukiah. Quadrelli admitted she never reached out to Mr. Dipman.

Another part of mother's case plan called for substance abuse treatment. Quadrelli had not noticed any progress in that area, given that following 60 days of treatment at WRA mother had relapsed on alcohol, methamphetamine and marijuana until the week previous to the hearing, when mother finally produced a clean test. Based on the multiple relapses, in Quadrelli's opinion, there was not a substantial likelihood mother would reunify with the minor if she were offered six more months of services.

### *The Juvenile Court's Rulings*

The juvenile court noted the absence of evidence on whether the initially assigned social worker had ever asked mother to sign a release for Dr. Garrett. "I think it is reasonable for the agency to allow that relationship to continue, but perhaps also important if mental health is an issue that we're concerned about for reunification

---

[3] On June 17, mother threatened suicide by jumping in front of a car on a roadway. Quadrelli offered to come pick her up to take her to Ukiah Valley Medical Center, and offered her a bed "in detox at Ford Street." Mother refused and Quadrelli requested that the Willits sheriff's office do a welfare check. Mother's drug use had an impact on her mental health in that she used methamphetamines, marijuana and alcohol to cope with her suicidal thoughts.

checking in would have been helpful." However, "given the sustained allegation for a methamphetamine-positive baby[,] . . . the primary service that she need to start with" was substance abuse treatment. "It is often the case . . . that parents with longstanding and serious substance abuse issues who are dual diagnosis do need to have some sobriety before they can effectively engage in counseling. [¶] . . . [T]his mother was offered intensive residential and outpatient substance abuse services designed to address that immediate need. She also gets supportive counseling in the form of one-to-one sessions with a substance abuse counselor. She gets ongoing contact with the social worker. [¶] There clearly is an awareness as evidenced in this report that the mother had a relationship with a physician who was addressing her mental health needs by way of prescription of psychotropic medications. There is some evidence of lack of complete compliance with this medication regime in that mother recently missed an appointment to renew her medication prescription. [¶] The mother in June was offered detoxification services. She was offered assessment services through the emergency room at Ukiah Valley Medical Center. She refused all of these offers by the social worker. [¶] Clearly the contact between the social worker and mother's mental health provider did not happen in the six-month review. It would have been helpful if it had happened. But I can't find on the totality of the evidence that the agency failed to offer reasonable services to [mother]. [¶] [Mother] did engage in services; however, she did not make significant progress and I am not confident that with extension of services that it would be possible for her to reunify with her son . . . ."

Accordingly, the court found by clear and convincing evidence that (1) reasonable services designed to help mother overcome the problems that led to the minor's removal and continued custody had been provided or offered; and (2) mother failed to regularly participate in and make substantive progress in her court-ordered treatment plan. The court also found no likelihood or substantial probability that the minor could be returned to his mother by the date of the 12-month review. The court terminated reunification

8

services and participation in FDDC, ordered weekly visitation, and set a permanent plan hearing for October 29, 2015.

Mother timely petitioned for extraordinary relief.

## DISCUSSION

### *Adequacy of Reunification Services*

Mother contends there is insufficient evidence to support the juvenile court's finding the Agency provided reasonable services with respect to the mental health component of her plan. Specifically, she argues "the agency never referred the mother to a medication assessment or individual counseling[,] . . . never attempted to get information regarding mother's mental health diagnosis from her previously treating psychiatrist, never attempted to verify that she was receiving any medication oversight and counseling, and never attempted to work with a therapist on a treatment plan."

In reviewing the challenged finding, we examine the record in the light most favorable to the juvenile court's order, to determine whether there is substantial evidence from which a reasonable trier of fact could have made the finding under the clear and convincing evidence standard. (*In re Isayah C.* (2004) 118 Cal.App.4th 684, 694.) We construe all reasonable inferences in favor of a finding regarding the adequacy of an agency's reunification plan and the reasonableness of its efforts. (*In re Julie M.* (1999) 69 Cal.App.4th 41, 46.) We likewise resolve conflicts in favor of such a finding and do not reweigh the evidence. (*In re Jasmine C.* (1999) 70 Cal.App.4th 71, 75.)

With certain exceptions not relevant here, whenever a child is removed from parental custody, the juvenile court must order the social worker to provide reunification services to the child's parents, "if the court determines that the services will benefit the child." (§ 361.5, subd. (a).) Moreover, when the child is under three years of age on the date of initial removal, court-ordered services shall be provided for a period of six months from the dispositional hearing but no longer than 12 months from the date the child entered foster care. (§ 361.5, subd. (a)(1)(B).) In such a case, the court may

9

terminate reunification services at the six-month review hearing and schedule a section 366.26 hearing if the court finds by clear and convincing evidence the parent failed to participate regularly and make substantive progress in the court-ordered plan.  (§ 366.21, subd. (e).)  Regardless of the parent's compliance with the case plan, however, if the court finds a substantial probability the child will be returned home within six months or that the services offered to the parent were unreasonable, the court must schedule a 12–month review hearing and extend services for another six months.  (*Ibid.*)  " 'Reasonable efforts' or 'reasonable services' means those efforts made or services offered or provided by the county welfare agency . . . to prevent or eliminate the need for removing the child, or to resolve the issues that led to the child's removal in order for the child to be returned home, or to finalize the permanent placement of the child."  (Cal. Rules of Court, rule 5.502(33).)

We begin our analysis by observing the Agency is not required to provide "the best [services] that might be provided in an ideal world," but only those that are reasonable under all the circumstances.  (*In re Misako R.* (1991) 2 Cal.App.4th 538, 547.)  Services are reasonable when the Agency has "identified the problems leading to the loss of custody, offered services designed to remedy those problems, maintained reasonable contact with the parents during the course of the service plan, and made reasonable efforts to assist the parents in areas where compliance proved difficult . . . ."  (*In re Riva M.* (1991) 235 Cal.App.3d 403, 414, italics omitted.)

In light of these principles, we acknowledge the Agency could have done more to get mother to sign a release to enable the social worker to make contact with mother's treating psychiatrist, Dr. Garrett.  At the time of the disposition hearing on January 15, 2015, mother was receiving mental health services at the Willits Family Center and seeing Dr. Garrett every two months at Mental Health in Ukiah.  These services included biweekly Prolaxin shots and nightly doses of Risperidone.  Mother's AODP counselor and her father stated that she "does very well when receiving regular doses of her

10

medication." At that time, the Agency committed to supporting mother in her admitted mental health struggles by "mak[ing] sure she is receiving services from Manzanita Mental Health Services, along with utilizing the services of a Parent Partner, offered by the Agency." But there was no need to refer mother for "medication assessment" when she was already getting treatment under a doctor's care and it appeared to be working.

With respect to a referral for individual counseling, the social worker *did* offer to refer mother to a therapist, but mother declined the offer because she had found a therapist on her own. Under these circumstances, it was not unreasonable for the social worker to allow mother to pursue that avenue before imposing her own choice of therapist on mother. Nor do we see the timing of that offer as unreasonable, given mother's inability to achieve abstinence from drugs. As the trial court observed, "It is often the case . . . that parents with longstanding and serious substance abuse issues who are dual diagnosis do need to have some sobriety before they can effectively engage in counseling."

The main obstacle to mother's reunification with her son is her addiction to drugs. Not unreasonably, the Agency focused on supporting mother's efforts to attain sobriety. Between January 15 and March 15, 2015, mother's mental health did not present any issues but she continued to test positive for controlled substances, despite the services put into place at disposition. Those services included a parent partner and access to a social worker assistant, referral to the Willits Family Center for "Intake Support Group, Daily AOD (Alcohol and Other Drugs) Assessment and treatment, random drug testing, housing assistance and parenting classes." Despite access to these services, mother kept relapsing and submitting dirty drug tests.

The Agency responded by stepping up its intervention. The Agency updated mother's case plan to include participation in FDDC, which in turn found a 60-day residential treatment program for mother in San Mateo County. Mother did well in the program and graduated from it on June 1, 2015, but she relapsed within days.

11

The record suggests that while mother was in San Mateo County, her Medi-Cal eligibility fell into a bureaucratic black hole. It seems mother may have stopped receiving shots of psychotropic medications in favor of oral medications because of this. Unfortunately, she sometimes forgot to take her pills, then doubled up on the dosage when she remembered. This was not working, and her mental health deteriorated after she returned to Mendocino County from the program in June. However, resumption of shot administration (as well as counseling with a therapist), appears to have been put on hold temporarily while mother reestablished her Medi-Cal eligibility in Mendocino County. Quadrelli's testimony suggested she was aware of the problem and was helping mother straighten out her Medi-Cal eligibility ("*we're* kind of hung up on that.") (Italics added.) Quadrelli remained in contact with mother and actually intervened in an emergency situation when mother apparently reported she was about to throw herself in front of cars in a roadway. Social worker Quadrelli offered to personally pick her up and take her to the hospital in Ukiah for evaluation, offered her a bed in a detoxification facility, and called for the sheriff's office to perform a welfare check on mother when her own efforts to assist were rebuffed. In our view, this record demonstrates reasonable services were offered.

The cases cited by mother are factually distinguishable and do not compel a different conclusion. In *In re Taylor J.* (2014) 223 Cal.App.4th 1446 (*Taylor J.*), the mother was ordered to participate in a department-approved domestic violence support group and low-cost conjoint counseling with her teenage daughter if recommended by the daughter's counselor. The department's services consisted of handing the mother two referral lists, one of which was outdated and the other of which listed only one agency that provided " 'domestic violence services' " near her home and no individual counseling for adults. The mother's pleas that she could not afford parenting classes or individual and conjoint therapy fell on deaf ears. (*Id.* at pp. 1448–1449.) After the mother found and enrolled in an online domestic violence program, she was informed

12

such a program was unacceptable to the department. (*Id.* at p. 1452.) "The record does not show that the worker made any effort to assist Mother to find an alternative person-to-person program in the vicinity of her home and one that she could afford." (*Ibid.*) The court found that the department's lackluster efforts failed to provide the mother and daughter with reasonable reunification services. (*Id*. at p. 1453.)

In *Tracy J. v. Superior Court* (2012) 202 Cal.App.4th 1415 (*Tracy J.*), fully cooperative but developmentally delayed parents were offered only supervised visitation. Multiple services tailored to their disabilities and designed to help them as parents were available, but none were offered. (*Id.* at p. 1428.) In *In re K.C.* (2012) 212 Cal.App.4th 323, 325 (*K.C.*), the department did little to help a mentally ill father secure a psychotropic medication evaluation, even though one was recommended in the father's psychological report, and the father's loss of custody was caused by his psychological problems. In *In re Alvin R.* (2003) 108 Cal.App.4th 962, 973 (*Alvin R.*), the department made a referral for conjoint counseling between the father and son to a therapist who did not have time to see them, and was located too far away. However, the department made no effort to help him find transportation or a different therapist, even though getting the father and son into conjoint counseling was a key part of the reunification plan on which all else hinged.

In all of these cases the departments failed to make any meaningful effort to support the parents in the key parts of their case plans that went to very reasons for their loss of custody, and then recommended the court terminate reunification services for the parents' lack of compliance with the case plan. Here, by contrast, mother's initial loss of custody was caused by her substance abuse issues. On this front, the Agency's provision of services cannot be faulted. The court's stated reasons for terminating services to mother relate to mother's inability to deal with her addiction and maintain sobriety, the same reason that caused the loss of custody.

With respect to mother's mental health challenges, at the time of the jurisdiction and disposition hearings, so far as this record shows, mother was adequately and appropriately addressing her mental health issues on her own. While the Agency provided support services, there was no demonstrated need for intense Agency intervention on the mental health front at that time. When mother returned from her program on June 1, relapsed, and began suffering from suicidal ideation during a hiatus in Medi-Cal funding for psychotropic medication shots, the social worker stepped up the services on the mental health front. Between June 10 and June 17, she offered to refer mother to a therapist and personally intervened to avert a suicidal crisis.

The adequacy of reunification plans and the reasonableness of a department's or agency's efforts are judged according to the circumstances of each case. (*Christopher D. v. Superior Court* (2012) 210 Cal.App.4th 60, 69.) As discussed above, the record before us is fundamentally different from those before the courts in *Taylor J.*, *Tracy J.*, *K.C.*, and *Alvin R.* We conclude substantial evidence supports the juvenile court's finding the Agency offered or provided mother with reasonable reunification services under the particular circumstances of this case.

## DISPOSITION

The petition for extraordinary writ is denied on the merits. (See Cal. Const., art. VI, § 14; *Kowis v. Howard* (1992) 3 Cal.4th 888, 894; *Bay Development, Ltd. v. Superior Court* (1990) 50 Cal.3d 1012, 1024.) The decision is final in this court immediately. (Cal. Rules of Court, rules 8.452(i), 8.490(b)(2)(A).)

_____
DONDERO, J.

We concur:


_____
HUMES, P.J.


_____
BANKE, J.

A145809