Filed 1/6/16  M.E. v. Superior Court CA1/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| M.E.,<br><br>        Petitioner,<br><br>v.<br><br>THE SUPERIOR COURT OF SAN MATEO COUNTY,<br><br>        Respondent;<br><br>SAN MATEO COUNTY HUMAN SERVICES AGENCY et al.,<br><br>        Real Parties in Interest. | A146527<br><br>(San Mateo County<br>Super. Ct. No. JUV83537) |

**INTRODUCTION**

Petitioner M. E. (mother) seeks extraordinary relief from orders of the juvenile court terminating reunification services with her son, J.G. (minor), and setting a permanency planning hearing under Welfare and Institutions Code section 366.26.[1] Mother argues the juvenile court's detriment finding is not supported by substantial evidence and the San Mateo County Human Services Agency (Agency) failed to provide her with reasonable services.  We conclude substantial evidence supports the juvenile court's detriment finding and decision to terminate services and set a section 366.26

---

[1] All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

hearing. We deny both the petition for extraordinary relief on the merits and the request for stay of the section 366.26 hearing.

## STATEMENT OF PROCEDURAL AND HISTORICAL FACTS[2]

*Petition and Detention*

On March 17, 2014, the Agency filed an amended section 300 dependency petition on behalf of J.G. (then age 6) and his three older half siblings. The petition alleged mother failed to adequately supervise and protect them (§ 300, subd. (b)) due to her chronic housing instability, involvement in violent relationships, difficulty managing the children's behavior, serious health issues requiring hospitalizations, and recurring allegations of physical abuse and neglect.[3] Mother had an extensive history of involvement with the Agency dating back to 2001, had received voluntary services, including parenting classes and counseling, since September 2013, and had failed to make substantial progress.[4] J.G. and his siblings were detained. Mother acknowledged she was no longer able to provide for her children's basic needs. At her request, J.G. and two of his siblings were placed with a maternal aunt in Bakersfield. M.L., two years older than J.G., had already been placed in shelter care at mother's request due to his behavioral issues.

*Jurisdiction and Disposition*

On March 18, 2014, mother submitted to the amended petition. The court sustained the allegations of the amended petition, adjudged the minors dependents of the

---

[2] The parties are well acquainted with the factual and procedural history underlying mother's claims of error, as evidenced by their pleadings in this writ proceeding. We therefore limit our summary to the facts we deem necessary to our subsequent discussion.

[3] The whereabouts of J.G.'s father, A.G., were unknown. He is not a party to this proceeding.

[4] From 2002 to 2012, the three older children had been placed with their maternal grandmother under a legal guardianship. After maternal grandmother died in mid-2012, the three older children were returned to mother.

2

court, continued their out-of-home placement and ordered reunification services to mother. Mother's case plan included parenting classes, counseling/psychiatric therapy, and drug and alcohol testing. Additional objectives included development of positive support systems, demonstration of her ability to supervise and correct her children, meet their physical, emotional, medical and educational needs, and maintain a legal source of income. A six-month review hearing was scheduled for September 11, 2014, with an interim review on June 26, 2014.

*The Six-Month Review*

The interim report prepared for the June review noted mother had relocated to San Diego for two months from the end of March to the end of May 2014. She had attained citizenship and was looking for work. Mother was homeless and needed housing assistance. Mother's schedule did not permit her to visit the children in June.

The status report for the six-month review hearing noted mother had no consistent address during May, June, or July 2014. Since August 1 she had been residing in an emergency shelter. She could not keep a scheduled visit with her children at the end of August 2014 because she had job interviews lined up. She was provided with bus passes every month for travel to Bakersfield, but between April and August 2014 she visited her children once, on July 11. Maternal aunt requested that a new home be found for J.G. closer to his mother, because of conflicts with his siblings. M.L. remained in a therapeutic foster home. Mother stated she needed help with housing, employment and clothing for job interviews. In July, the Agency made a referral to a community worker to assist mother in locating resources. She had begun weekly counseling in July 2014. She remained homeless.

Due to mother's continued lack of housing and employment, the Agency recommended that the children remain dependents placed in out-of-home care, but that mother receive six more months of family reunification services. At the six-month review hearing held on September 23, 2014, the court found that returning J.G. to mother

3

would create a substantial risk of detriment, the Agency had provided reasonable services, and mother had made minimal progress toward alleviating the causes of the dependency. The court extended services for another six months. The 12-month review hearing was scheduled for February 26, 2015. A return home date of March 10, 2015 was envisioned.

## *The 12-Month Review*

The 12-month status review report noted that J.G. struggled with schoolwork in first grade and was being evaluated for Attention Deficit Hyperactivity Disorder (ADHD). Mother had spoken with J.G.'s therapist. She continued to attend parenting classes. She had not missed a session with her therapist and had completed classes in stress management, financial education, communication and conflict resolution, art therapy and a 12-step recovery program offered at her shelter.

Visitation with J.G. had increased since his move to a foster home in San Jose on September 21, 2014. Mother visited J.G. six times between November 9, 2014 and February 9, 2015, including a family visit on December 23, 2014, and three times between March 16 and April 20, 2015. She missed a visit on October 30, 2014. Although the visits went well, mother told the social worker she believed J.G. would be better off remaining in foster care for the time being, because transitions were challenging for him. Mother was no longer pursuing reunification with her two oldest children and agreed they should remain in Bakersfield. Mother continued to reside at the shelter. She planned to move to Fresno with a boyfriend she had met at the shelter. She believed she could find housing and employment in Fresno while maintaining visitation with her children. The social worker viewed this plan as unrealistic.

The Agency's report recommended termination of reunification services at the 12-month status review hearing, stating: "[J.], [Y.], and [I.] were removed due to the mother's chronic housing instability, involvement in violent relationships and recurring allegations of physical abuse and neglect of the children. During the last twelve months

4

of services, the mother has been unable to secure either ongoing employment or housing that would be available to her children. While her visits with the children, individual mental health therapy and parent education have been positive and beneficial, she has not created the change in her situation that would create stability for her children if they were returned to her despite her participation in the programs at her shelter related to housing and employment." Noting that the mother had received a total of 17 months of services when voluntary services were included, the Agency's report concluded: "Given the mother's long history of employment and housing instability, it appears likely she will need longer than the next six months to reach the level of stability she will need to reunify with [J.G.] as her plans for stability are in chronic influx [*sic*] for a variety of reasons posed by the mother."

The 12-month review hearing scheduled for February 26, 2015 was continued to April 22, 2015 for a contested hearing. An addendum report stated that J.G. had been diagnosed with ADHD and prescribed medication, but mother opposed medicating J.G.[5] Mother had begun working 20 hours a week as a cashier at IKEA in East Palo Alto and expected to be promoted to full-time in the near future. She was no longer planning to move to Fresno and was continuing to search for housing and employment in the Bay Area. She was still living in the shelter. J.G. was conflicted about whether he wanted to return home with his mother or go back to Bakersfield to live with his great-aunt; he wanted to live with both. The report concluded: "[I]t appears likely [mother] will need longer than the next six months to reach the level of stability she will need to reunify with [J.G.]." However, the report suggested that legal guardianship with the maternal great-aunt "offers a window for the mother to reunify with [J.G.] when she ameliorates the concerns for removal and the issues described in the petition are mitigated."

---

[5] Mother withdrew her opposition in June 2015.

5

On April 22, 2015, the court extended family reunification services.[6] The court also ordered that J.G. stay in his current placement until the end of the school year, followed by an extended visit with his family in Bakersfield. The 18-month review hearing was set for August 4, 2015, with an interim review on July 9, 2015.

*The Interim Review*

With respect to housing, the report for the interim review on July 9 indicated that on April 27, 2015, the social worker spoke to Janice Lam of the San Mateo County Housing Department, who gave her a list of documents mother needed in order to complete her family unification program (FUP) application. On May 12, 2015, mother inquired whether she could use a Section 8 voucher outside of San Mateo County and was informed by the social worker there was only a "small possibility" of that happening. Mother then indicated she wanted to "hold off" on the application because she was overwhelmed and was trying to decide whether to seek a transfer to an IKEA store in a more affordable area. On May 26, 2015, mother told the social worker she wanted to "resume the FUP process with a transfer of her [Section 8] voucher to Fresno County,"

---

[6] The record on appeal does not include a reporter's transcript for the April 22, 2015 review hearing. Nor does the clerk's transcript show the court's reasons for extending services. When a dependent child is not returned to parental custody at the 12-month review hearing, the court may continue reunification services and set a permanency review hearing within 18 months from the date a child was removed from parental custody "only if it finds that there is a substantial probability that the child will be returned to the physical custody of his or her parent . . . and safely maintained in the home within the extended period of time or that reasonable services have not been provided to the parent . . . ." (§ 366.21, subd. (g)(1).)

In order to find a substantial probability of return, the court is required to find the parent has consistently visited the child (§ 366.21, subd. (g)(1)(A)); the parent has made significant progress in resolving the problems that led to removing the child (§ 366.21, subd. (g)(1)(B)); and "[t]he parent . . . has demonstrated the capacity and ability both to complete the objectives of his or her treatment plan and to provide for the child's safety, protection, physical and emotional well-being, and special needs." (§ 366.21, subd. (g)(1)(C).) We presume the court made the requisite findings.

6

where she could live with her boyfriend in a van she had in Bakersfield. On June 3, mother signed the FUP application and the social worker turned it in. On June 11, 2015, mother left the shelter because her time of residency there had expired, and she was currently living with her boyfriend in a tent. She remained employed as a part-time cashier, working between 20 and 34 hours a week, and reported she expected a raise when she completed 90 days of employment on July 25.

Mother visited with J.G. on May 4, May 18, June 3, and June 8, 2015.

Mother appeared by telephone for the July 9, 2015 interim review hearing and asked for additional help in finding housing; she had been looking, but it was "very difficult." The social worker stated the Agency was "planning to provide her with additional referrals for shelter as well as her application for the family reunification program is in process." J.G.'s visit with his maternal great-aunt in Bakersfield was extended for an additional 30 days and a hearing date of August 4, 2015 for the 18-month review was reconfirmed.

### The 18-Month Status Review

The 18-month status review report for the August 4 hearing stated J.G. had been staying in Bakersfield at his great-aunt's (Ms. Brown's) house since June 12, 2015. Mother had made one phone call to J.G. during his stay in Bakersfield. She had not visited him there, despite three offers of Greyhound bus vouchers by the social worker. Mother told Ms. Brown her work schedule made it difficult for her to call J. G. more frequently or visit him in Bakersfield. The social worker attempted twice to speak with mother without success.

On July 15, 2015, Ms. Brown told the social worker she had concerns about continuing to care for J.G. due to his physically aggressive behavior towards the family's

7

cats and his jealousy of Ms. Brown's granddaughter.[7]  On July 20, 2015, the social worker visited J.G. and Ms. Brown in Bakersfield.  Ms. Brown informed the social worker she was no longer willing to care for J.G. and requested that he leave her home as soon as the Agency could find him another placement.  For his part, J.G. reported he missed his friends and wanted to return to San Jose; his aunt's granddaughter was mean to him and bullied him; and he did not want to stay in Ms. Brown's house.

With respect to housing, on July 21, 2015, the social worker learned from mother's previous case manager at the long-term shelter that mother had been given a housing voucher for Innvision, and she was on a waiting list.  Mother had rejected a shelter located in San Francisco because the bus ride to her job at IKEA in East Palo Alto was too long.  A list of shelters was e-mailed to mother on July 14, 2015.  Information on job training programs was e-mailed to her in mid-August.[8]

The Agency recommended that reunification services be terminated based on inadequate visitation and mother's chronic housing instability.  Mother saw housing as the only obstacle to J.G.'s return home, but the social worker had expressed to mother that the Agency's "concern is not limited to her lack of housing, it is the overall level of stability she would be able to provide [J.G.] with upon his return.  The mother has had 18 months with no children in her care to obtain stable employment and during that time she has obtained only part-time employment.  She has consistently reported to the

---

[7] J.G. could not get his ADHD medication prescription filled in Bakersfield because he was at Ms. Brown's home on an "extended visit," not as a "placement."  For the same reason, Ms. Brown could not get foster care payments or supportive services to take care of him.  Also, mother refused to approve J.G.'s participation in a day camp that "would keep him in physical activity conducive to managing his ADHD symptoms from seven in the morning until 6 in the evening."

[8] The job training offered was for "custodial technician I and II."  A hiring event was for various maintenance worker positions, starting at $13 or $14 per hour for entry level work. Another hiring event was for babysitters and caregivers, paying $11/hour.

undersigned that her partner is a significant source of support to her and theirs is a healthy relationship; however, their combined resources as well as support from the Project We Hope Shelter where they met, has led only to further homelessness when they ran out of eligibility for the shelter. The mother has focused on the Section-8 Housing Voucher the undersigned has submitted for [her] as a solution to her now chronic homelessness; however, this focus fails to address the mother's overall level of stability and her ability to consistently manage the portion of a rent Voucher that would be her responsibility."

The social worker concluded that J.G.'s difficulty transitioning into the stable environment of Ms. Brown's home was exacerbated by his ADHD symptoms and "his ongoing uncertainty as to whether he will remain with his aunt or return to his mother's care. The uncertainty regarding his permanency has been emotionally damaging for [J.G.]. He has continued to voice his concerns, and at times lack of desire to live with his mother, and he deserves the emotional stability of a permanent placement."

At the social worker's request, J.G. was removed from his great-aunt's home and placed at his former foster home. Mother appeared at the hearing on August 4, 2015. Mother's counsel complained the social worker had done "very little" to help mother find housing. According to counsel, mother had completed all of her services and "[h]ousing is the last thing holding up this reunification." The matter was continued to October 1, 2015, for a contested review hearing.

In an addendum report prepared for the upcoming hearing, the social worker revealed that on September 17, 2015, she informed mother by e-mail that the Agency would not be providing her "with a Family Unification Program Housing Voucher due to ineligibility based on the Agency not recommending [J.G.]'s return."[9] Mother had

_____

[9] On August 14, 2015, the social worker had e-mailed mother that "[r]egarding the FUP, I have made repeated inquiries about the status since I submitted the application and it is

9

visited with J.G. on August 25 and September 3. Mother and foster mother exchanged phone numbers to facilitate visitation; however, it was difficult to catch up with mother on the phone.

Mother did not attend the contested hearing held on October 1, 2015, at which the social worker testified. The social worker agreed that, at the earlier contested hearing on April 22, 2015, the court had found mother made substantial progress in her case and granted her four more months of reunification. However, she disagreed housing was the only remaining issue at the present time.

As to housing help, the social worker testified that when mother was at the shelter she "received assistance in our housing search from a case manager there." Since June, when mother had to leave that shelter, "[t]he agency has made a two-part effort. We have shared with her information regarding shelter options as well as an application was made on her behalf for the family unification program [housing voucher]. However, it was denied based on the agency'[s] position that [J.G.] should not be returned to her." "Those three efforts I outlined have been the agency's efforts."

Mother reported she was in the process of renting a trailer, but did not confirm she had secured it. Mother reported she could not attend the hearing because she was working. In the social worker's opinion, mother's progress had been minimal because she had made "insufficient effort in her employment search," having been unemployed from September 2013 to April 2015. Her current employment would "not allow for an environment free of neglect for [J.G.]. That is our primary concern." Although mother had been working for several months and had recently gotten promoted, the social worker's assessment was "based on a very long history of employment instability which . . . has been reported in past reports and it's also been confirmed by her older children.

---

still unclear to me what the status is. I have requested the support of my new supervisor, . . . and we will be meeting on Monday August 17, 2015 and will confirm your eligibility status as soon as possible."

10

This is a long pattern, a long history of employment instability. And I see it as insufficient effort that her current employment would not be able to provide . . . an environment for [J.G.] that would not have neglect." Her assessment was also based on mother's history of 15 past referrals, including two substantiated general neglect allegations, as well as the experience of her older children, reflected in her 18-month report.[10]

The most significant change in services over the previous four months was that the social worker arranged for mother and J.G.'s foster mother to schedule unsupervised visitation themselves, without the social worker's intervention. Initially, mother had more contact by phone with the foster mother, but recently contact had dropped off significantly. Further, the infrequent phone calls have involved mother's speaking with J.G. more than with the foster mother, and mother's boyfriend speaking with J.G. more than mother speaks with him. Mother had not spoken with J.G.'s therapist since April 2015. Mother's main concern about J.G.'s well-being has been that he not become addicted to his ADHD medication. Mother eventually became agreeable to the request that J.G. be medicated, but the social worker was concerned that she would stop his medications if she had the chance, due to her strongly held beliefs about the dangers posed by the medication. Mother was patient and focused when helping J.G. with his homework on unsupervised visits. The social worker could not say how much mother had benefited from the parent education she received because the social worker was not

_____

[10] Interviewed on April 30, 2015 by the social worker, mother's 17-year-old son stated: " 'After she gets a place, a month or two later she's back where she began,' " and further stated he could think of three instances when his mother lost her housing. His 14-year-old sister "stated that she wasn't sure she agreed with his statement," since mother now had a job after not having one for years. The son expressed the opinion that [J.G.] should stay with his great-aunt because " '[i]t could happen again, the homeless nonsense.' " He also said he was still angry with his mother. His sister said she did not share her brother's anger and felt her mother " 'tries her best.' "

11

present during mother's mostly unsupervised visits. She was present during supervised visits with M.L. and J.G. Mother remained calm when M.L.'s behavior escalated; she also relied on support staff for assistance when he had a strong reaction to something.

The social worker had met with J.G. monthly over the previous four months. J.G. talked about wanting to live with his mother, his foster mother, at his great-aunt's home in Bakersfield, and at the social worker's home, indicating to the social worker that "there is a great deal of confusion for him around this issue of where he's going to live." The social worker believed the confusion has caused him "considerable emotional harm."

Initially, J.G. had expressed resistance to living with mother and her boyfriend. The other children clarified that, in the past, mother had spent more of her time and attention on previous boyfriends than with the children, sometimes locking them out of the shelter room to " ' entertain boyfriends.' " Since building a relationship with the current boyfriend, J.G. was more focused on wanting to live with mother because she said M.L. would be there (which was unlikely), and also promised them both dogs and goldfish.

During the previous four months, mother had one unsupervised visit with J.G. and one supervised joint visit with J.G. and M.L. During J.G.'s extended visit with his great-aunt in Bakersfield, mother called J.G. infrequently.

J.G.'s CASA worker expressed the opinion to the social worker on September 25 that J.G.'s needs would be best met by his foster mother or by an adoptive home. Her opinion was based on her weekly visits with J.G. and her communications with the foster mother. Minor's attorney joined with the Agency's position that it would not be in the minor's best interest to return him to mother at that time, and that services should be terminated.

The court found by clear and convincing evidence that reasonable services had been offered and mother had not made substantive progress to the extent that J.G. could be returned to her on that day, particularly in light of the "virtual lack of contact . . . in the

12

last two or three months."  The court terminated services to mother, adopted the other orders as proposed by the Agency, and set the section 366.26 hearing.

## DISCUSSION

Mother challenges the juvenile court's finding by a preponderance of the evidence that "the return of the child to [his parent] would create a substantial risk of detriment to the safety, protection, or physical or emotional well-being of the child."  We review the juvenile court's detriment finding for substantial evidence.  (*In re E.D.* (2013) 217 Cal.App.4th 960, 966.)  "The 'substantial risk of detriment' standard 'must be construed as a fairly high one.  It cannot mean merely that the parent in question is less than ideal, did not benefit from the reunification services as much as we might have hoped, or seems less capable than an available foster parent or other family member.' [Citation.]  In applying this standard, the juvenile court should consider only whether the parent shows a 'grasp of the important parenting concepts—things such as a child's need for security, adequate nutrition and shelter, freedom from violence, proper sanitation, healthcare, and education.' "  (*Id.* at p. 965.)

The Agency bears the burden of establishing detriment.  (§ 366.22, subd. (a); *In re Yvonne W.* (2008) 165 Cal.App.4th 1394, 1400 (*Yvonne W.*).)  "In making its determination, the court shall review and consider the social worker's report and recommendations and the report and recommendations of any child advocate." (§ 366.22, subd. (a).)  The court must also consider "the extent to which the parent participated in reunification services [citations] . . . [and] the efforts or progress the parent has made toward eliminating the conditions that led to the child's out-of-home placement." (*Yvonne W.,* at p. 1400.)

We find substantial evidence here.  By the time of the 18-month review hearing on October 1, 2015, J.G. had been out of parental custody for at least 19 months, since mother acknowledged she could no longer care for his basic needs and voluntarily agreed to his placement with her aunt in Bakersfield in February 2014.  The record reflects she

13

had received at least 24 months of services, counting the voluntary family maintenance case plan started in September 2013. Mother's participation in her case plan appears to have peaked around March or April 2015, when she met with J.G.'s therapist, was seeing her own therapist weekly, attended classes in parenting, stress management, financial education, communication, conflict resolution, art therapy, and a 12-step recovery program offered by the shelter, was visiting J.G. regularly (nine times between November 2014 and April 2015), and had landed a part-time job as a cashier with IKEA. However, she remained homeless, living in a shelter. Despite the Agency's recommendation that services be terminated, the court extended services for another six months, no doubt in recognition of the tremendous strides she had made toward reunification.

However, soon thereafter mother's efforts began to flag. Although she agreed J.G. should spend a long visit with his great-aunt in Bakersfield, and despite the availability of bus passes from the Agency, mother did not visit J.G. at all while he was there and called him only once. She overstayed her time in the shelter and had to leave. She lived in tent for a while with her boyfriend, and was looking into renting a trailer. Once J.G. returned to his foster placement in San Jose, visitation did not increase, despite mother having maximum flexibility to arrange her visits directly with the foster mother. She had two visits with J.G. between July and October 2015. In the social worker's opinion, J.G.'s confusion about where he was going to live had already caused him harm.

At the 18-month review hearing, which mother did not attend, the court expressed great concern over mother's lack of visitation with J.G. The Agency, J.G.'s attorney, and J.G.'s CASA volunteer opposed J.G.'s return to mother. While mother is to be commended for maintaining employment for over six months by the time of the 18-month review, the overall record before us is one of mother's inability to stabilize her housing situation, find full time employment over a two-year period, or maintain regular visitation with J.G., and shows that mother was, in minor's counsel's words, not "in a position to tend to [J.G.'s] therapeutic . . . and other mental health needs, his educational

14

needs, let alone safe and stable housing." Substantial evidence supports the juvenile court's detriment finding.

Mother also contends the Agency failed to provide reasonable services to address her housing issues. "The 'adequacy of reunification plans and the reasonableness of the [Agency's] efforts are judged according to the circumstances of each case.' [Citation.] To support a finding reasonable services were offered or provided, 'the record should show that the supervising agency identified the problems leading to the loss of custody, offered services designed to remedy those problems, maintained *reasonable* contact with the parents during the course of the service plan, and made *reasonable* efforts to assist the parents in areas where compliance proved difficult. . . .' [Citation.] 'The standard is not whether the services provided were the best that might be provided in an ideal world, but whether the services were reasonable under the circumstances.' " (*Tracy J. v. Superior Court* (2012) 202 Cal.App.4th 1415, 1426.) We review a challenge to the reasonableness of services for substantial evidence. (*In re Alvin R.* (2003) 108 Cal.App.4th 962, 971; *Amanda H. v. Superior Court* (2008) 166 Cal.App.4th 1340, 1346.)

Here, the Agency provided some services designed to assist mother to find housing. The social worker testified that when mother was at the long-term shelter she "received assistance in our housing search from a case manager there." This referral was made in July 2014. Since June 2015, when mother had to leave that shelter, "[t]he agency has made a two-part effort. We have shared with her information regarding shelter options as well as an application was made on her behalf for the family unification program [housing voucher]. However, it was denied based on the agency'[s] position that [J.G.] should not be returned to her." "Those three efforts I outlined have been the agency's efforts."

Whether these services were adequate is a close question. On the one hand, mother's vacillation about whether she wanted to try to find housing in San Diego (April and May 2014), or Fresno (March and April 2015), or near her job in East Palo Alto,

15

exacerbated the difficulty of helping mother find suitable housing. On the other hand, if the Agency not taken the position that J.G. should not be returned to mother, and withdrawn the application for a housing voucher, mother's housing issue might have been resolved—in the short term. But as the social worker noted in the status report for the 12-month review, "mother has focused on the Section-8 Housing Voucher the undersigned has submitted for her as a solution to her now chronic homelessness; however, this focus fails to address the mother's overall level of stability and her ability to consistently manage the portion of a rent Voucher that would be her responsibility." The social worker's view was echoed by mother's older son, I., who stated that mother had lost her housing at least three times when he lived with her. Finally, the housing voucher was meant for family unification, and by the time the voucher application was withdrawn in September 2015, the Agency's recommendation that services be terminated was driven as much by mother's decreasing contact with J.G., as by her chronic housing instability. Under these circumstances, and given the limits of substantial evidence review, we will not disturb the juvenile court's finding that reasonable services were provided.

We are also cognizant that "[a]ny discretion to extend services beyond the 18 months for extraordinary circumstances logically would lie in the granting of a continuance of the 18–month review hearing pursuant to section 352, subdivision (a), which allows a juvenile court to 'continue any hearing under this chapter beyond the time limit within which the hearing is otherwise required to be held.' However, continuances will not be granted willy-nilly; the proponent must meet stringent requirements. First, a continuance will not be granted if it is contrary to the minor's interest, and in discerning that interest, the court must give substantial weight to the 'minor's need for prompt resolution of his or her custody status, the need to provide children with stable environments, and the damage to a minor of prolonged temporary placements.' [Citation.] Second, a continuance will only be granted on a showing of good cause, and

16

only for the period of time shown to be necessary. [Citation.] We conclude that given the imperative to resolve dependency cases in a timely fashion, a continuance for 6 months after an 18-month review would be outside the scope of what the Legislature intended with enactment of the continuance statute. The result would be 'a 24-month review, which does not exist in California's dependency statutes.' [Citation.]" (*Denny H. v. Superior Court* (2005) 131 Cal.App.4th 1501, 1510–1511.) Given the ample evidence that J.G. had already suffered significant detriment from prolonged temporary placements, the court's decision not to extend services any longer was well within its discretion.

## DISPOSITION

The petition for extraordinary writ is denied on the merits. (See Cal. Const., art. VI, § 14; *Kowis v. Howard* (1992) 3 Cal.4th 888, 894; *Bay Development, Ltd. v. Superior Court* (1990) 50 Cal.3d 1012, 1024.) The decision is final in this court immediately. (Cal. Rules of Court, rules 8.452(i), 8.490(b)(2)(A).)

The request for stay of the section 366.26 hearing is denied.

17

 

_____\
DONDERO, J.

We concur:


_____\
HUMES, P.J.


_____\
BANKE, J.


A146527